760 P.2d 1120

**BECO CORPORATION, an Idaho corporation, Plaintiff–Respondent–Cross Appellant,**

v.

**ROBERTS & SONS CONSTRUCTION COMPANY, INC., Defendant–Appellant–Cross Respondent,**

and

**Edward C. Roberts, dba Roberts & Sons Construction Company, and Continental Casualty Insurance Company, Defendants–Cross Respondents.**

No. 16575.

Supreme Court of Idaho.

April 1, 1988.

Rehearing Denied Sept. 21, 1988.

Webb, Burton, Carlson, Pederson & Webb, Twin Falls, for defendant-appellant-cross respondent. Lloyd J. Webb and Curtis Webb, argued.

Fuller & Carr, Idaho Falls, for plaintiff-respondent-cross-appellant. Mark R. Fuller, argued.

BISTLINE, Justice.

Beco Corporation is an Idaho corporation based in Idaho Falls whose sole stockholder is Doyle H. Beck. Roberts & Sons Construction Company, Inc., is a Utah corporation located in Pleasant Grove, Utah. Edward C. Roberts and his wife own all the stock. In the past, Roberts & Sons had been licensed to do business as a foreign corporation in Idaho and had done construction work previously in Idaho. How-

ever, during the time relevant to this appeal, Roberts & Sons was no longer registered with the Secretary of State.

In December of 1983, Beco contracted with Roberts & Sons to haul topsoil in Arizona. Roberts & Sons was the prime contractor on a highway project for the State of Arizona. The purpose of the contract was to relandscape and reseed the area around four overpasses which had suffered severe erosion. Beco's subcontract required it to haul topsoil necessary for the reseeding.

In late 1983 Kurt Anderson, an agent of Roberts & Sons, sought prices from potential subcontractors. At trial, testimony did not establish definitively whether Anderson initiated the contact with Doyle Beck. Negotiations ensued as Beck and Ed Roberts discussed the terms of the subcontract over the phone. Beck drafted the agreement in Idaho Falls on a standard form produced by the Idaho branch of the Associated General Contractors of America. Beck signed it and mailed the contract to Ed Roberts who signed and mailed it back to Beck in Idaho Falls.

In late December 1983, Beco began work on the construction site in Arizona. Beco's drivers discovered that after crossing the site several times their equipment bogged down in mud beneath the dry, cracked surface. Previous inspections by both parties prior to executing the contract, gave no warning of the subsurface water.

Beco notified Roberts & Sons and the State of Arizona of the muddy conditions. Roberts & Sons obtained permission from the state to stop work to allow the ground to dry out. Beco removed its equipment from the site and never returned. When the job site had dried, Roberts & Sons completed Beco's contract performance at its own expense prior to the time specified in the subcontract when Beco's complete performance was due.

Roberts & Sons paid Beco the agreed contract price for the topsoil it hauled. Beco then brought this action alleging it was entitled to additional compensation from Roberts & Sons because of the un-

foreseen expenses resulting from the muddy conditions. Continental Casualty Insurance Company, Roberts & Sons' surety on the project, was joined as a defendant in an attempt to collect against the payment bond.

Defendants moved to dismiss for lack of jurisdiction over the person. This motion was denied by Judge George. Pursuant to leave granted by the court, defendants amended their answers to add a counterclaim for their expense in completing Beco's contractual obligations on the highway project.

A jury trial was held on May 15 to May 19, 1986. Judge George denied the defendant's motion to dismiss for lack of jurisdiction over the person and denied their motion for a directed verdict made at the close of Beco's case. The jury reached a verdict for Beco on its claim and against Roberts & Sons on its counterclaim. Roberts & Sons requested that the court return the jury to deliberate on the ground that the verdict was inconsistent. Judge George denied the request.

Roberts & Sons filed motions for a new trial, judgment n.o.v., and to amend the judgment. At trial, Beco's evidence was directed entirely at Roberts & Sons Construction Company. The motion to amend the judgment was to alter the party against whom the judgment was entered, from Ed Roberts, the individual, to Roberts & Sons Construction Company. Judge George denied Roberts & Sons' motion for a new trial or for a judgment notwithstanding the verdict and granted the motion to amend the judgment. Notices of appeal and cross appeal were timely filed.

Roberts & Sons' appeal requires us to address the following issues:

1. Did the Idaho court have *in personam* jurisdiction over Roberts & Sons Construction Co., a Utah corporation?

2. Was Beco Corporation's work removing its trucks from the mud something necessarily required in the performance of the contract and, therefore, work for which no additional compensation is required?

3. Is a summary admissible under Idaho Rule of Evidence 1006, if the proponent of the summary fails to make the underlying materials on which the summary is based available to the opposing party for inspection?

4. Is a verdict which awards damages on the contract and holds that the contract has been rescinded inconsistent?

Both parties seek attorney fees on appeal. In addition, Beco is seeking attorney fees at the trial level based upon language in the performance bond issued by Continental Casualty Insurance Co.

I.

Roberts & Sons moved for a directed verdict based on lack of jurisdiction at the close of Beco's case and for a judgment notwithstanding the verdict following trial. The question of the existence of personal jurisdiction over a non-resident defendant is one of law which we review freely.

The question poses a two part analysis. First, Roberts & Sons actions must fall within the terms of our "long arm" statute, I.C. § 5–514. Second, Roberts & Sons must have had minimum contacts with Idaho such that assertion of Idaho jurisdiction will not violate defendant's right to due process of law guaranteed by the Fourteenth Amendment of the United States Constitution. *Schwilling v. Horne*, 105 Idaho 294, 297, 669 P.2d 183, 186 (1983); *See International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Idaho Code § 5–514 provides in relevant part as follows:

**Acts subjecting persons to jurisdiction of courts of state.—**

(a) The transaction of *any business* within this state which is hereby defined as the doing of *any act* for the purpose of realizing pecuniary benefit or accomplishing or attempting to accomplish, transact or enhance the business purpose or objective or any part thereof of such person, firm, company, association or corporation; I.C. § 5–514(a) (1979) (emphasis added).

The first question is whether the conduct of Roberts & Sons falls within the terms of this very broadly worded statute.

■ The legislation is designed to provide a forum for Idaho residents, and, as remedial legislation of the most fundamental nature, is to be liberally construed. *Doggett v. Electronics Corp. of America*, 93 Idaho 26, 454 P.2d 63 (1969). But even without the rule of liberal construction, it is evident that the statute applies.

■ The statute itself defines "transaction of *any business* within this state" as "the doing of any act for the purpose of realizing pecuniary benefit." Roberts & Sons conduct of negotiating a contract price with Beco, agreeing that Doyle Beck should draft the agreement, executing the document over Beck's signature, and mailing the contract back to Idaho Falls certainly falls within the broad statutory language.[1] The fact that Roberts & Sons maintained no physical presence in Idaho does not affect the applicability of the statute. *Southern Idaho Pipe & Steel Co. v. Cal–Cut Pipe & Supply, Inc.*, 98 Idaho 495, 567 P.2d 1246 (1977).

■ The closer question is whether Roberts & Sons had sufficient minimum contacts with Idaho such that the assertion of jurisdiction would be fair. Since the legislature in adopting I.C. § 5–514 intended to exercise all the jurisdiction available to the State of Idaho under the due process clause of the United States Constitution, *Doggett*, supra, 93 Idaho 26, 30, 454 P.2d 63, 67, we must turn to our federal cases for guidance while bearing in mind that the minimum contacts test is not susceptible of mechanical application and each case requires an *ad hoc* analysis of the jurisdictional facts. *Schwilling v. Horne*, 105 Idaho 294, 298, 669 P.2d 183, 187 (1983).

The leading case involving a contract dispute is the recent *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Burger King Corporation sued Rudzewicz, a franchisee residing in Michigan, in Florida for breach of franchise obligations and trademark infringement. The court ruled that the assertion of jurisdiction by a Florida court did not offend due process even though Rudzewicz and his partner had done business mainly, although not exclusively, with the Michigan office of Burger King.

Reviewing prior cases, Justice Brennan reasoned that the minimum contacts required by *International Shoe v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), are supplied if the defendant "purposefully directs" his activities at residents of the forum state and the litigation arises out of or relates to those activities. *Id.* 105 S.Ct. at 2182. In contracts cases, those who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to suit in the other state for the consequences of their activities. *Id.*

If minimum contacts exist, the analysis takes one further step:

> Once it had been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S., at 320, 66 S.Ct., at 160. Thus courts in "appropriate case[s]" may evaluate "the burden on the defendant," "the forum State's interest in adjudicating the dispute," "the plaintiff's interest in obtaining convenient and effective relief," "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and the "shared interest of the several States in furthering fundamental substantive social societies." *World–Wide Volkswagen Corp. v. Woodson, supra*, 444 U.S., [286] at 292, 100 S.Ct., [559] at 564. These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of

---

1. The very definition of "transact" is to prosecute negotiations. Black's Law Dictionary, p. 1341, 5th ed. (1979).

minimum contacts than would otherwise be required.... On the other hand, where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable. *Burger King,* at 2184–2185. (citations omitted).

Applying these guidelines to the case at hand we believe there is sufficient evidence in the record to support the district court's assertion of jurisdiction over Roberts & Sons. There was evidence of defendant-initiated contacts. Doyle Beck testified as follows:

> Q. Can you explain to me how you first became aware that there was a project going on in Arizona as best you recall?
>
> A. It seems to me like—I can't remember—I had run into Kurt somewhere. Maybe he had come into our office or something. *But I remember him*[2] *asking me if we wanted to put our equipment to work during the winter on a job he had down in Arizona.*
>
> Q. And who was Kurt employed by then?
>
> A. Well, he represented to me that he was joint venturing the project with Roberts & Sons of Provo. Tr., pp. 9–10 (emphasis added).

In addition, the contract price was negotiated over the telephone with calls originating from both Idaho Falls, Idaho, and Pleasant Grove, Utah. Tr., pp. 146–148. After Beco left the job site, Kurt Anderson called or visited Idaho Falls several times around April 9, 1984, to determine when, or if, Beco intended to return. Tr., pp. 363–364. At about the same time period, Ed Roberts sent a Western Union mailgram to Beco informing it that unless arrangements for Beco's return to the site were made by 8 a.m. on April 13, 1984, Beco would be "defaulted for failure to perform." Plaintiff's Exhibit No. 14.

Thus, there is evidence in the record that Roberts & Sons deliberately reached out beyond Utah to negotiate with an Idaho corporation and executed a contract which established a relationship of some months with Beco. While the relationship here was not as enduring nor as complex as that of Rudzewicz with Burger King Corp. (20-year franchise), it was certainly more involved than that which obtained in *McGee v. International Life,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) (a single, mailed life insurance renewal letter), cited repeatedly in *Burger King.*

Entering into a contract is by its nature an intentional, purposeful act. *Manufacturer's Lease Plans, Inc. v. Alverson,* 115 Ariz. 358, 565 P.2d 864, 866· (Ariz.1977). However, the *Burger King* court specifically rejected the notion that a contract *alone* establishes minimum contacts. *Burger King, supra,* 105 S.Ct. at 2185.[3] Instead, the court emphasized that the dealings between the parties prior to, and following, the execution must be examined. *Id.,* 105 S.Ct. p. 2186. We have completed such an examination above; and finding repeated defendant-initiated contacts, we are satisfied that the guidelines of *Burger King* are met.

Turning to the question of whether the assertion of jurisdiction comports with "fair play and substantial justice," we find that it does. In this case, a leading consideration is whether it would unduly burden Roberts & Sons to litigate in Idaho Falls as opposed to Provo, Utah, the county seat of Roberts & Sons home office. Since the towns are approximately 200 miles apart, Roberts & Sons case is not compelling that trial in Idaho is unreasonable. There are trial venues *within* each state separated by greater distance. This case is *unlike Asahi Metal v. Superior Court of California,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed. 2d 92 (1987), where a majority of the Court could agree only that it was unduly burden-

---

**2.** Kurt Anderson testified that he couldn't remember who initiated the contact. Tr., pp. 101–102.

**3.** See Brewer, Jurisdiction in Single Contract Cases, 64 Ark. Little Rock L.J. 1. (1983).

some to require a *Japanese* defendant to litigate thousands of miles from home.

In addition, the forum state's interest in adjudicating the dispute is strong. Jurisdiction here is asserted under Idaho's long-arm statute through which the legislature intended to provide a forum for Idaho residents. *Doggett, supra.*

Thus, the trial court had an adequate basis upon which to assert jurisdiction over Roberts & Sons and we affirm the court's denial of a judgment n.o.v. on the jurisdictional ground.

## II.

 Next, we consider the merits. Roberts & Sons contends that the trial court erred by denying its motion for a new trial since there was no evidence to support the jury's verdict awarding damages for the performance of "extra work." We affirm the trial court.

The decision to grant a motion for a new trial is directed to the sound discretion of the trial judge. After weighing the evidence, a denial of a motion for a new trial will not be overturned absent a manifest abuse of discretion. We believe the evidence is sufficient to support the jury verdict.

Both parties cite to *Obray v. Mitchell,* 98 Idaho 533, 567 P.2d 1284 (1977), as providing the definition of "extra work." In *Obray,* we read:

Extra work means work done which is not required in the performance of the contract, something done or furnished in addition to or in excess of the requirements of the contract.

98 Idaho at 537, 567 P.2d at 1288, citing *Dravo Corp. v. Municipality of Metropolitan Seattle,* [79 Wash.2d 214] 484 P.2d 399 (1971), and 13 McQuillan, Municipal Corporations § 37.165. See also, *Cutler v. Geissler,* 107 Idaho 637, 691 P.2d 1252 (Ct.App.1984).

Neither this definition nor our cases provides concrete guidance on the issue. However, if we read further in the McQuillan treatise, *supra,* we gain some insight on the matter in the context of public works contracts:

*There can be no true test to determine whether or not certain work falls within the classification in a contract for public work, other than the understanding of the parties.* The law prescribes no rules to govern with respect to matters of this kind, but leaves the parties to group and classify for purposes of contract according to any standard or system they may choose to adopt, and when controversy arises, *all it seeks to do is to ascertain, as the true test, the understanding of the parties.* 13 McQuillan, *supra,* § 37.165. (emphasis added).

Regarding the understanding of the parties, their contract provides no help since "extra work" is undefined. However there was testimony concerning whether either Beco or Roberts anticipated the muddy conditions at the time of contracting:

[MR. FULLER]: Were the site conditions different from what you expected?

[MR. ROBERTS]: I believe site conditions are different in almost every job than what you expect. Sometimes they are devastating, sometimes they are in your favor.

Q. Would you classify these as devastating?

A. They weren't very pleasant to manage.

Q. It was a disaster, wasn't it?

A. It was for us.

Q. Were you aware of the previous flooding, and that that flooding would cause a problem?

A. No.

Q. Would a view of the surface reveal that any problem would result?

A. Oh, when you realize that there had been a flooding and there was evidence, you could see it, *but you didn't look for it before bidding.*

Q. *Roberts & Sons didn't know?*

A. *No.*

Q. *And Beco didn't know?*

A. *No.* Tr., p. 334–5. (emphasis added).

In addition, photographs of the site admitted as Plaintiff's Exhibit Nos. 24 and 25, show trucks buried up to the wheel hubs in subsurface mud covered by a cracked and deceptively dry looking surface, thus corroborating the testimony of Mr. Roberts.

The state's specifications [4] for the project (Plaintiff's Exhibit No. 2), upon which contractors relied when preparing their bids, state that when test holes were drilled in the area, no water was noted in any of the test holes. Case law has established a rule that

> under appropriate circumstances, the contractor who encounters substantially different conditions in performing a construction contract from those contemplated and set forth in the plans and specifications contained therein may be entitled to increased compensation for the additional work. See generally 76 A.L.R. 268; 85 A.L.R.2d 212. The test of whether or not such contractor is entitled to additional compensation is whether or not he justifiably relied upon the plans and specifications for the construction in making his bid and entering into the contract. (citations omitted). The reason for this rule is that if unanticipated conditions not reasonably foreseeable are actually encountered in the work and vary substantially from anticipated conditions reasonably foreseeable by the parties at the time they entered into the contract, the contractor is performing an entirely different contract than the one agreed upon and in such case is entitled to the reasonable value of his additional services. *Hash v. R.T. Sundling & Son, Inc.*, 150 Mont. 388, 436 P.2d 83, 86 (1967).

*Accord Sornsin Construction Co. v. State*, 180 Mont. 248, 590 P.2d 125 (Mont. 1978); *L.A. Young Sons Construction Co. v. County of Tooele*, 575 P.2d 1034 (Utah, 1978); see also, *Zontelli & Sons v. City of Nashwauk*, 373 N.W.2d 744 (Minn.1985); *Metropolitan Sewerage Commission v. R.W. Construction, Inc.*, 72 Wis.2d 365, 241 N.W.2d 371 (1976).

The A.L.R. annotation cited by the *Hash* court, *supra*, 76 A.L.R. 268, "Right of public contractor to allowance of extra expense over what would have been necessary if conditions had been represented by the plans and specifications" provides additional support:

> It may be further observed that apparently, as to contracts undertaken upon the unit basis, as distinguished from contracts in gross, special importance generally attaches to the work being other than as defined; for in many of such cases the contract may be readily interpreted as one to perform only work of the indicated character. 76 A.L.R. 268, 269.

Significantly, Beco's contract was on a unit basis. Roberts & Sons agreed to pay $2.00 per cubic yard for the dirt that Beco hauled.

Thus, the evidence was ample that the muddy conditions were not contemplated by the parties at the time of contracting. The trial court did not abuse its discretion by denying Roberts & Sons' motion for a new trial.

### III.

■ Next, we consider Roberts & Sons claim of error regarding the admission of evidence. The contention is made that the court erred by admitting Plaintiff's Exhibit No. 9. The exhibit included a list of Beco's costs directly attributable to the muddy conditions and provided the only direct evidence of Beco's damages covering its "extra work" claim. Roberts & Sons asserts that the exhibit is inadmissible under I.R.E. 1006 as a summary for which the advancing party failed to make the underlying materials available for inspection by the opposing party.

But Roberts & Sons' argument ignores the principal basis upon which the exhibit was admitted. The exhibit was actually admitted as a business record exception to the rule against hearsay, Tr., p. 48, pursu-

---

4. The specifications were incorporated by reference into the contract between Roberts & Sons and Beco.

ant to I.R.E. 803(6), which provides as follows:

> (6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

A trial court's decision to admit business record evidence will not be overturned absent a clear showing of abuse. *Cheney v. Palos Verdes Investment Corp.*, 104 Idaho 897, 665 P.2d 661 (1983). Idaho Rule of Evidence 803(6) is consistent with former I.C. § 9–414 which prior cases had held must be broadly construed. *Curiel v. Mingo*, 100 Idaho 303, 597 P.2d 26 (1979). Thus, in doubtful or close cases, the evidence should come in.

Doyle Beck testified that the Exhibit was a summation produced from daily time cards of individuals and from daily job activity sheets produced by his employee Theron Nebeker. The activity sheets were admitted as Plaintiff's Exhibit No. 23. The summary was produced no later than February 24, 1983 when it was submitted to Roberts & Sons for payment. The costs for which reimbursement was requested were incurred between December 15, 1983, and February 2, 1984.

These facts bring the case in line with *Cheney, supra.* There this Court affirmed a trial court admission of monthly summaries of feed consumed by livestock. The summaries were prepared from daily feed sheets which had been destroyed. There,

as here, the evidence was produced in the ordinary course of business, at or near the time of occurrence and not in anticipation of trial. These qualities supply the degree of trustworthiness necessary to justify an exception to the rule against hearsay.

Since we affirm the trial court's admission of the exhibit under I.R.E. 803(6), we need not address Roberts & Sons' contention that it was inadmissible under I.R.E. 1006.

### IV.

Roberts & Sons next argue that the jury's verdict was fatally inconsistent since it awarded damages and yet held that the contract had been rescinded. While we cannot but agree with the proposition that rescission and damages are incompatible remedies, it is abundantly clear that rescission was not an issue before the jury.

The special verdict made no inquiry of the jury regarding rescission. R., p. 161–62. Nor was the jury instructed on the law of rescission. Instead, the jurors were instructed on the concept of waiver. R., p. 154. Apparently, they were persuaded that Roberts & Sons waived its right to complain of Beco's incomplete performance when they elected to complete the dirt hauling *prior* to the date upon which Beco's completed performance was due.

Consequently, the trial court correctly refused to return the jury to the jury room to reconsider its allegedly inconsistent verdict. Roberts & Sons argument borders on the frivolous.

### ATTORNEY FEES

On its cross-appeal, Beco asks us to reverse the trial court's denial of attorney fees. Beco's claim for attorney fees was based upon language in the payment bond supplied by Roberts & Sons surety, Continental Casualty Insurance Company. The court denied attorney fees based on a supposed lack of jurisdiction over the defendant insurance company pursuant to I.C. § 54–1927. R., p. 194.

However, the trial judge misread and misapplied the statute. The issue of

whether I.C. § 54–1927 is a jurisdiction or a venue provision has not been addressed in our cases. But, since our act was based on the federal Miller Act, this Court has held that we will look to the federal cases for guidance. *City of Weippe v. Yarno*, 96 Idaho 319, 528 P.2d 201 (1974). Although the lower federal courts have differed, a decision by the Supreme Court of the United States put the matter to rest:

> We also agree with the courts below that venue under the Miller Act for suit on the shipment diverted to South Carolina properly lay in the Eastern District of California. The Act provides:
>
> > Every suit instituted under this section shall be brought in ... the United States District Court for any district in which the contract was to be performed and executed and not elsewhere...." 40 U.S.C. § 270(b).
>
> Petitioners argue that this provision bars a district court in California from adjudicating respondent's claims arising from the shipments of plywood delivered in South Carolina. *But § 270(b) is merely a venue requirement* and there was clearly a sufficient nexus for its satisfaction. *F.D. Rich Co., Inc. v. United States, Industrial Lumber Co., Inc.,* [417 U.S. 116] 94 S.Ct. 2157, 2163 [40 L.Ed.2d 703] (1974) (emphasis added).

Moreover, and more importantly, the trial judge erred in applying the Idaho statute in the first place. Idaho Code §§ 54–1925 through–1930 is known as the Public Contracts Bond Act, I.C. § 54–1925. By its terms, it applies to public contracts for public works within the State of Idaho:

> **Performance and payment bonds required of contractors for public buildings and public works of the state, political subdivisions and other public instrumentalities—Requirement for bonds.**—Before any contract for the construction, alteration, or repair *of any public building or public work or improvement of the state of Idaho, or of any county,* city, town, municipal corporation, township, school district, public educational institution, or other political subdivision, public authority, or public instrumentality, or of any officer, board,

commission, institution, or agency of the foregoing, is awarded to any person, he shall furnish *to the state of Idaho, or to such county,* city, town, municipal corporation, township, school district, public educational institution, or other political subdivision, public authority, or public instrumentality, or to such officer, board, commission, institution, or agency thereof, bonds which shall become binding upon the award of the contract to such person, who is hereinafter designated as "contractor"[.] I.C. § 54–1926 (Supp. 1987) (emphasis added).

Common sense dictates that the Act cannot apply to an *Arizona* highway project payment bond.

Counsel for Beco argued for the application of Arizona law based on choice of law principles, Tr., vol. 3, pp. 50–66, which argument failed to move the court. But no elaborate choice of law analysis is required to come to the conclusion that a payment bond issued under Arizona statutes must be enforced under Arizona law. Therefore, we reverse and remand to the district court to determine if attorney fees are appropriate to the prevailing party under A.R.S. § 34–201, *et seq.* If the court determines that trial level fees are called for, then it shall address Beco's request for attorney fees on appeal applying Arizona law.

Costs to respondent.

SHEPARD, C.J., and HUNTLEY, J., concur.

DONALDSON, J., sat, but did not participate due to his untimely death.

BAKES, Justice, dissenting:

I dissent from Part I of the majority opinion because it incorrectly analyzes the requisite constitutional minimum contacts necessary to establish jurisdiction in Idaho courts. Regarding Part II, even if the Idaho district court did have jurisdiction over the defendant Roberts & Sons, the additional effort required by Beco to haul the topsoil through the muddy terrain was not "extra work" under the subcontract. There are several provisions of the subcon-

tract which prohibit payment of additional sums beyond that contracted to be paid by Roberts under the subcontract. The jurisdictional question is analyzed first.

## I

As the majority properly recognizes, the defendant is the focal point in jurisdictional inquiries. *Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). It is the activities of the defendant, not the plaintiff, that determine minimum contacts. The Court's opinion does not perform an adequate minimum contacts analysis. Realizing that the contacts in the instant case do not meet the minimums discussed in *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), the majority excuses the deficiency simply by stating:

> "While the relationship here was not as enduring nor as complex as that of Rudzewicz with Burger King Corp. (20–year franchise), it was certainly more involved than that which obtained in *McGee v. International Life,* [355 U.S. 220] 78 S.Ct. 199 [2 L.Ed.2d 223] (1957) (a single, mailed life insurance renewal letter), cited repeatedly in *Burger King.*" *Ante* at 708, 760 P.2d at 1124.

The minimum contacts test was extended to its outer limits in *McGee v. International Life Ins. Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). Note, Long–Arm Jurisdiction in Commercial Litigation: When is a Contract a Contact, 61 B.U.L. Rev. 375, 378 (1981). In *McGee* the Court upheld an assertion of jurisdiction by a California state court over a Texas insurance company whose contact with the state was the solicitation and execution of an insurance contract with a California resident. The life insurance company had solicited the re-insurance contract from the petitioner's son and then refused to pay a claim under the policy. In rendering its decision, the United States Supreme Court focused upon four factors: (1) the insurance company solicited the insurance contract which was delivered to and accepted by a California resident; (2) the insured

mailed the policy premiums from California until his death; (3) California residents would be at a "severe disadvantage" if forced to pursue their claims in a distant forum, effectively rendering the insurance company judgment proof; and (4) California had a manifest interest in providing its residents with an effective means of redress when an insurance company refused to pay its claims. *McGee v. International Life Ins. Co.,* 355 U.S. at 223, 78 S.Ct. at 201. Since *McGee* represents the high water mark in confirming state court jurisdiction over foreign defendants, should any of these four factors be missing the minimum contacts necessary for jurisdiction cannot be found.

The majority opinion has already established that the first factor is not met. At page 705, 760 P.2d at page 1121, *ante,* the opinion states, "At trial, testimony did not establish definitively whether Anderson initiated the contact with Doyle Beck." Further, the colloquy reported at page 708, 760 P.2d at page 1124 notes that neither party can remember who initiated the contact. Thus, on the first *McGee* factor alone, a finding of minimum contacts cannot be made.

*McGee* cannot be read in isolation, however; six months later it was followed by *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). The *Hanson* court carefully noted that the defendant in *McGee* had a *"substantial* connection" with the forum. *Id.* at 252, 78 S.Ct. at 1239, emphasis added. *Hanson* stressed the *McGee* defendant's initial solicitation of the plaintiff within the forum, as well as California's statutorily expressed "manifest interest" in the subject matter of the suit (a narrowly-drawn long arm statute dealing with insurance companies soliciting business in California, discussed *infra* ). It was the combination of these factors, along with the contract, that formed an adequate jurisdictional foundation. As noted above, it was not established at trial that Roberts & Sons initially solicited Beco. Since this solicitation factor is missing in this case, there is no jurisdiction in Idaho courts, based on *McGee* and *Hanson.*

714

Our guidance is not limited to *McGee* and *Hanson,* however. Preceding both cases was *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). And subsequent to *McGee* and *Hanson,* the court has announced a myriad of other benchmark cases. Chronologically, these include *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977); *Kulko v. Superior Court,* 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Rush v. Savchuk,* 444 U.S. 320, 100 S.Ct. 571, 62 L.Ed.2d 516 (1980); *Burger King Corp. v. Rudzewicz, supra;* and, most recently, *Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County, supra.* When all these cases are combined, a sequential three-step jurisdictional test emerges. In order for jurisdiction to be constitutionally asserted over a non-resident defendant:

1. the non-resident must have acted in an affirmative manner to "purposefully avail[ ] itself of the privilege of *conducting activities within the forum State,* thus invoking the benefits and protections of its laws";[1] (emphasis supplied);

2. the defendant's in-state activities must constitute a substantial connection with the forum when the suit arises out of transactions conducted outside the forum; and,

3. the assertion of jurisdiction must not offend the due process "traditional notions of fair play and substantial justice."[2]

This three-step test places paramount importance on the relationship "among the defendant, the forum, and the litigation,"[3] and guarantees the protection of a non-resident's due process rights. Each step must be independently satisfied before proceeding to the next. Factors relevant to the fairness or reasonableness of a jurisdictional assertion should not be considered until the "purposeful availment" and "arising out of" requirements are met. To do otherwise results in a deprivation of due process.[4]

Minimum contacts analysis requires that a non-resident purposefully avail itself of the benefits and protections of a forum before becoming subject to its jurisdiction. This is the first step of the analysis, and application of the test "cannot be simply mechanical or quantitative."[5] Each case requires an *ad hoc* analysis of the jurisdictional facts.[6]

Establishing contractual relations is by definition voluntary, and might therefore be labeled purposeful activity. Such activity alone, however, does not satisfy the requirement.[7] Rather, additional factors must indicate a defendant's intent to associate itself with the forum. These factors include foreseeability, consent, the contractual terms, and the defendant's behavior relevant to the contract. Each factor will be analyzed in turn.

The United States Supreme Court has stated that " 'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process

1. *Hanson v. Denckla,* 357 U.S. at 253, 78 S.Ct. at 1240. *Accord, International Shoe Co. v. Washington,* 326 U.S. at 319, 66 S.Ct. at 160; *Shaffer v. Heitner,* 433 U.S. at 216, 97 S.Ct. at 2586; *Kulko v. Superior Court,* 436 U.S. at 94, 98 S.Ct. at 1698; *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. at 297, 100 S.Ct. at 567; *Rush v. Savchuk,* 444 U.S. at 329, 100 S.Ct. at 577; *Burger King Corp. v. Rudzewicz,* 471 U.S. 473–75, 105 S.Ct. at 2183; and *Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County,* 480 U.S. at 109, 107 S.Ct. at 1031.

2. *International Shoe Co. v. Washington,* 326 U.S. at 316, 66 S.Ct. at 158, *quoting Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940).

3. *Shaffer v. Heitner,* 433 U.S. at 204, 97 S.Ct. at 2579.

4. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 475–77, 105 S.Ct. at 2184.

5. *International Shoe Co. v. Washington,* 326 U.S. at 319, 66 S.Ct. at 160.

6. *Schwilling v. Horne,* 105 Idaho 294, 298, 669 P.2d 183, 187 (1983).

7. *Burger King Corp. v. Rudzewicz,* 471 U.S. at 477–79, 105 S.Ct. at 2185.

Clause."[8] Although foreseeability of consequences may not be determinative, a defendant's reasonable expectations of amenability to suit are relevant in determining the purposeful nature of its acts. "[T]he foreseeability that is critical to due process analysis ... is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.* at 297, 100 S.Ct. at 567.

In *Burger King*, it was the defendant's refusal to make the contract's required payments and the defendant's continued use of trade marks and confidential business information that caused foreseeable injuries to the plaintiff.[9] In the instant case, however, no such factors are present. Roberts & Sons did not refuse to make payments under the contract; in fact, it paid Beco for every cubic yard of landscape barrow it loaded, hauled and dumped. Further, as both parties have testified, Beco's hauling problems were not foreseeable. Neither Roberts & Sons nor Beco, when they examined the premises in Arizona, foresaw that apparently dry land could be saturated with water underneath, which resulted in the mud that ultimately caused Beco's alleged damages. Certainly, Roberts & Sons could not reasonably foresee itself being haled into an Idaho court, when all performance under the contract was to be in, and was in fact, accomplished in Arizona.

Next, regarding the consent factor, a defendant may reasonably anticipate amenability to suit in a forum by consenting to a particular forum's jurisdiction. Express consent may result from designation of an in-state agent to receive service of process. Such express consent is not found in the instant action.[10] However, constructive consent may, under certain circumstances, be given through state jurisdictional statutes. This is particularly appropriate when the state has expressed its interest in the subject matter of the suit through a narrowly-drawn special jurisdictional statute. When a defendant acts within a state which has such a special statute, such as a special statute relating to a foreign insurance company's soliciting business in a state, it may establish constructive consent to jurisdiction.[11] The United States Supreme Court re-emphasized the importance of special jurisdictional statutes in *Shaffer v. Heitner*, 433 U.S. at 214–216, 97 S.Ct. at 2585–2586, and *Kulko v. Superior Court*, 436 U.S. at 98, 98 S.Ct. at 1700.

The statute involved in the instant action is neither narrowly drawn, nor is it a special jurisdictional statute. It is a broad based general long arm statute, addressing no industry in particular, as did the California statute in *McGee*. The majority recognizes this when it says, "The question is whether the conduct of Roberts & Sons falls within the terms of this very broadly worded statute." *Ante* at 707, 760 P.2d at 1123. Thus, there is nothing in this record to suggest that Roberts & Sons consented to Idaho court jurisdiction, either expressly or through state jurisdictional statutes.

Another factor in "purposeful availment" analysis is the contract's choice-of-law provisions. A choice-of-law provision indicates the parties' preference for application of a particular body of substantive law. A defendant who voluntarily chooses a particular jurisdiction's laws cannot later claim that it has not manifested an intent to avail itself of the benefits and protections of the laws of that state.

**8.** *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. at 295, 100 S.Ct. at 566.

**9.** *Burger King Corp. v. Rudzewicz,* 471 U.S. at 479–480, 105 S.Ct. at 2186.

**10.** At one time, Roberts & Sons had a business office, a foreign corporation registration, and a registered agent in Idaho. All such connections had been severed, however, for more than a year prior to the time when the parties entered the subcontract in the instant case.

**11.** *Hanson v. Denckla,* 357 U.S. at 252–53, 78 S.Ct. at 1240 (discussing *McGee v. International Life Ins. Co.*). In *McGee*, California had enacted a special statute that subjected foreign insurance companies to jurisdiction. 355 U.S. at 221, 78 S.Ct. at 200. The existence of the statute provided reasonable notice to foreign insurance companies that the state had a special interest in the field of insurance, and that soliciting business within the state would render them amenable to California's jurisdiction.

In the instant case, the governing law was to be that of the State of Arizona. The last paragraph of the original contract between Roberts & Sons and the State of Arizona reads: "IT IS ALSO UNDERSTOOD AND AGREED that this contract is subject to A.R.S. § 28–1824, § 28–1825, § 28–1826, together with all other limitations pursuant to the applicable laws of the State of Arizona relating to public contracts and expenditures." The parties to the subcontract also selected Arizona law. Article I of the subcontract states:

"**Article I. Performance of work.** The Subcontractor shall ... perform all labor required for the completion of the said work in accordance with all provisions of the original contract ... all of which are hereby made a part of this agreement...."

The provisions of the original contract were incorporated into the subcontract. Accordingly, defendant Roberts & Sons (and the plaintiff Beco) chose Arizona law as the governing law, too. This factor points to jurisdiction in Arizona—not in Idaho.

A final factor to be considered in the "purposeful availment" analysis is the defendant's behavior relevant to the contract, *i.e.*, its solicitation and performance of the contract. *McGee v. International Life Ins. Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). As noted above, evidence regarding solicitation in the instant case is inconclusive. Evidence regarding performance shows that all the work was to be performed in the State of Arizona. *In toto*, the evidence points to jurisdiction in Arizona, but not in Idaho.

In summary, the threshold test of a minimum contacts analysis, "purposeful availment," is not met. None of the above factors show that Roberts & Sons acted in an affirmative manner to "purposefully avail itself of the privilege of conducting activities within the forum [State of Idaho]." *Hanson v. Denckla*, 357 U.S. at 253, 78 S.Ct. at 1239–1240.

"This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts...." *Burger King Corp. v. Rudzewicz*, 471 U.S. at 473–75, 105 S.Ct. at 2183 (citations omitted).

The instant case most closely resembles an "attenuated" contact. The entire subcontract was to be fully performed in Arizona and within forty working days; the franchise contract in *Burger King*, conversely, contemplated a twenty-year relationship. The defendant in *Burger King* deliberately reached beyond Michigan for the purchase of a long term franchise and the manifold benefits that would derive from affiliation with a nationwide organization. This twenty-year relationship envisioned continuing and wide reaching contacts with the plaintiff Burger King. 471 U.S. at 479–80, 105 S.Ct. at 2186. The subcontract between Beco and Roberts & Sons, on the other hand, anticipated a forty working day relationship in Arizona and nothing else. Neither does the evidence show that Roberts & Sons deliberately reached into Idaho to gain substantial benefits; the evidence regarding solicitation is inconclusive.

Roberts & Sons did not deliberately "reach out beyond one state and create continuing relationships and obligations with citizens of another state [Idaho]." *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 70 S.Ct. 927, 929, 94 L.Ed. 1154 (1950). Even *McGee v. International Life Ins. Co., supra*, the high water mark case of jurisdictional analysis, required a more "substantial connection" with the forum than occurred in this case. 78 S.Ct. at 201. Borrowing from the factors specifically enumerated in *Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. at 112, 107 S.Ct. at 1033, Roberts & Sons does not do business in Idaho; it has no office, agents, employees, or property in Idaho; and it has not been shown that Roberts & Sons advertises or otherwise solicits business in Idaho. On the basis of these facts, the exertion of personal jurisdiction over Roberts & Sons by the Idaho district court exceeds the limits of due process. Accordingly, I would reverse the judgment of the district court and dismiss the action for lack of jurisdiction over the defendant, Roberts & Sons.

## II

Proper resolution of the jurisdictional issue would render all other issues raised by the parties moot. Nevertheless, I also dissent from Part II of the majority opinion, the "extra work" issue in this case. The genesis of this "extra work" issue is Article XIV of the subcontract itself. A contract's meaning, its legal effect, and whether it is ambiguous are all questions of law. *Barr Development, Inc. v. Utah Mortgage Loan Corp.*, 106 Idaho 46, 675 P.2d 25 (1983); *Laight v. Idaho First Nat. Bank*, 108 Idaho 211, 697 P.2d 1225 (Ct.App.1985). Accordingly, we are not bound by the district court's decision regarding "extra work." *Clark v. St. Paul Property & Liability Ins. Companies*, 102 Idaho 756, 639 P.2d 454 (1981). No ambiguity issue was raised, and we can exercise free review as we interpret the contract. *Shipley v. Cook*, 109 Idaho 537, 708 P.2d 942 (Ct. App.1985).

Beco, not Roberts, selected the subcontract used in the instant action which, in pertinent part, reads:

"**Article XIV. Claims for Extra Work or Damages.**

"The Contractor will pay for extra work performed and materials furnished by the Subcontractor, under written authorization by the Principal's [State of Arizona Highway Department] engineer, ... as and when it is paid therefor by the Principal. *Any claim of the Subcontractor for extra work and/or materials not so authorized, or for damages of any nature whatsoever, shall be deemed waived by Subcontractor unless written notice thereof is given the Contractor within ten days after the date of its origin.*

"It is distinctly understood and agreed by Subcontractor that this agreement is made for the consideration herein named, and *that the Subcontractor has, by examination, satisfied himself as to the nature and location of the work, the character, quantity and kind of materials to be encountered,* the character, kind and quantity of equipment needed during the prosecution of the work, *the location, conditions and other matters which can in any manner affect the work under this agreement.* No verbal agreement with any agent either before or after the execution of this agreement shall affect or modify any of the terms or obligations herein contained and this contract shall be conclusively considered as containing and expressing all of the terms and conditions agreed upon by the parties hereto. No changes, amendments or modifications of such terms or conditions shall be valid or of any effect unless reduced to writing and signed by the parties hereto." (Emphasis added.)

Thus, Beco assumed risks like the one spawning the instant action; *i.e.,* Beco assumed the risk of muddy conditions at the jobsite. By the express terms of the subcontract, Beco "distinctly understood and agreed ... that this agreement is made for the consideration herein named [$2.00 per cubic yard of landscape barrow loaded, hauled and dumped], and that [Beco] has, by examination, satisfied [it]self as to the nature and location of the work, the character, quantity and kind of materials to be encountered, [and] ... the location, conditions and other matters which can in any manner affect the work under this agreement." Included in "the nature ... of the work, ... the location, conditions and other matters" were the muddy conditions of the jobsite.

Further demonstrating that Beco assumed the risk of muddy conditions are other provisions in the subcontract. The $2.00 per cubic yard payment stated in the subcontract was full compensation for doing all work contemplated in the agreement, for all loss and damage arising out of the nature of the work, and for all risks connected with the work. As stated in Article XV of the subcontract:

"**Article XV. Basis and Scope of Payment.**

"Payment will be made to the Subcontractor for work actually performed and completed, as measured and certified to by the Principal's engineer, at the unit prices hereinafter specified, which shall be accepted by the Subcontractor as *full compensation* for furnishing all material

and *for doing all work contemplated and embraced in this agreement;* also for all loss and damage arising out of the nature of the work aforesaid, and *for all risks of every description connected with the said work;* also for all expense incurred by the Subcontractor by or in consequence of the suspension or discontinuance of the work." (Emphasis added.)

Finally, in yet another subcontract provision, Beco, in its chosen contract, agreed to accept $2.00 per cubic yard of barrow loaded, hauled and dumped as full compensation: (1) for doing all work contemplated by the agreement; (2) for all loss or damage arising out of the nature of the work; and (3) for all loss resulting from the action of the elements or from any unforeseen difficulties or obstructions encountered in the prosecution of the work. It expressly acknowledged such in the third paragraph of Article XIX, providing:

"In consideration of the promises, covenants and agreements of the Subcontractor herein contained and the full, faithful and prompt performance of this agreement and the plans and specifications constituting a part thereof, the Contractor agrees to pay to Subcontractor and Subcontractor agrees to receive and accept as *full compensation for doing all work* and furnishing all materials, supplies, etc., *contemplated and embraced in this agreement,* also for all loss or damage arising out of the nature of the work aforesaid, *or from the action of the elements, or from any unforeseen difficulties* or obstructions which may arise or be *encountered in the prosecution of the work* until its acceptance by the Principal, *and for all risks of every description connected with the work;* also for all expenses incurred by or in consequence of the suspension or discontinuance of the work, and for well and faithfully completing the work and the whole thereof, in the manner and according to the terms of this agreement and the requirements of the Contractor and instructions of the engineers in charge of said work, payment at the following unit prices: [$2.00 per cubic yard of #803 landscape barrow loaded, hauled and dumped]." (Emphasis added.)

Accordingly, under the express terms of the subcontract which it selected, Beco assumed the risk of encountering mud on the jobsite. Beco contends, however, that it should be paid for the additional expense of hauling the topsoil with its equipment through the mud under Article XIV of the contract, which states that "[t]he Contractor will pay for extra work performed ... by the Subcontractor...."

The task of moving the topsoil on its equipment through the mud was not "extra work," but was "additional work" necessary to accomplish that which it had contracted to do. Idaho case law has delineated the distinction between the terms. In *Cutler v. Giessler,* 107 Idaho 637, 691 P.2d 1252 (Ct.App.1984), the following concise explanation is given:

"The distinction between extra and addition work was explained by our Supreme Court in *Obray v. Mitchell,* 98 Idaho 533, 567 P.2d 1284 (1977), where the Supreme Court said that 'extra' work arises outside and entirely independent of the contract, while 'additional' work is something necessarily required in the performance of the contract and without which the contract could not be carried out." 107 Idaho at 639, 691 P.2d at 1254.

Beco characterized its claim as one for "extra work" when, in fact, it was for additional, but unforeseen work in performing its contract. The subcontract does not permit Beco to recover for additional unforeseen work in performing its contract. In moving its trucks through the mud in the process of hauling topsoil Beco was merely performing its obligation included in the original subcontract. Accordingly, Beco's claim is one for "additional work" or effort expended in the performance of its subcontract obligation without which the subcontract could not have been performed. When the subcontract was made, both parties contemplated that Beco's trucks would have to travel from the source of the topsoil to the site where the topsoil was to be dumped. Said travel was required by the subcontract which stated

that Beco's duties include "loading, hauling and dumping" landscape barrow. To fulfill its obligation under its subcontract, Beco had to drive its trucks loaded with the topsoil from the material source site to the location where the materials would be used. That is what it had contracted to do. The contract provided that payment of $2.00 per yard for landscape materials delivered at the destination point was

> *full compensation for doing all work* and furnishing all materials, supplies, etc., contemplated and embraced in this agreement, [and] also *for all loss or damage arising out of the nature of the work* aforesaid, or *from the action of the elements*, or *from any unforeseen difficulties or obstructions which may arise or be encountered* in the prosecution of the work ... and for all risks of every description connected with the work...." (Emphasis added.)

The contract further provided that "the subcontractor has, by examination, satisfied himself as to the nature and location of the work, the character, quantity and kind of materials to be encountered, the character, kind and quantity of equipment needed during the prosecution of the work, and *the location, conditions and other matters which can in any manner affect the work under this agreement*." (Emphasis added.) By its very terms the subcontract precludes additional compensation for any additional expense incurred by Beco in getting his trucks and equipment through the muddy spots in order to deliver the topsoil from the material source to the site of construction.

Further, under Article XIV of the subcontract, payments for "extra work" must be authorized by the "Principal's [State of Arizona Highway Department] engineer," and the contractor will pay the subcontractor for "extra work" only "as and when it is paid therefor by the Principal [State of Arizona Highway Department]." These are two distinct prerequisites to the subcontractor's receipt of an "extra work" payment. First, regarding the authorization requirement, the Standard Specifications of the State of Arizona, Department of Transportation, Highway Division, state

that in order for extra work to be paid for it must

> "be set forth on a supplemental agreement form, which will specify the work to be done and the basis for compensation....

> "Upon receipt of an approved supplemental agreement, the contractor shall proceed with the ordered work; however, he shall proceed with the work before the receipt of an approved supplemental agreement if so ordered in writing by the Engineer." State of Arizona, Dept. of Transportation, Highways Division Standard Specifications §§ 104.03, 109.04 (1982 ed.).

At a minimum, "extra work" required written authorization from the State of Arizona's engineer. In plaintiff's Exhibit No. 7, however, the State of Arizona responded to Roberts & Sons' notice concerning the mud as follows:

> "Dear Sir:

> "Your letter is not clear as to the location or what alleged problem exists. Assuming that you are referring to a mud condition for your haul vehicles, this is to be expected whenever it rains.

> "This is not extra work as defined as Standard Specifications Subsection 104.-02, and there will be no payment as called for under Standard Specification Subsection 104.03."

Thus, there was no authorization by the principal's engineer concerning "extra work."

Neither was the second prerequisite met. Under the express terms of the subcontract chosen by Beco, Roberts & Sons must pay Beco for "extra work" only "as and when it is paid therefor by [Arizona]." Roberts & Sons received no "extra work" payment from Arizona, and therefore under Beco's subcontract no extra work payment to Beco was required.

Finally, Article XIV of the subcontract states that extra work claims "shall be deemed waived by Subcontractor unless written notice thereof is given the Contractor within ten days after the date of its origin." According to Beco Corporation's

Daily Record, its trucks "kept getting stuck" beginning on December 15, 1983. Accordingly, Beco should have given Roberts & Sons written notice of its extra work claim by December 25, 1983. The record does not disclose any timely notice. In fact, the uncontroverted evidence shows written notice was not given until months later. Obviously, by then the 10-day notice period had expired, and Beco's claim was deemed waived.[12]

In sum, there are at least four reasons for denying Beco's "extra work" claim. First, Beco expressly assumed the risk of muddy terrain. Second, movement of its equipment through the mud was simply "additional work," not "extra work." Third, the State of Arizona's denial of any claim that the muddy conditions fostered "extra work" precluded Beco's claim against Roberts. And fourth, Beco's claim is deemed waived because it failed to give timely written notice.

### III

The foregoing analysis points out the quandary in which Roberts & Sons finds itself as a result of today's decision. It is faced, in Idaho, with a court decision that the additional expense to which Beco was put in order to move the topsoil as the result of the muddy conditions was "extra work" under the subcontract provisions for which it must pay additional compensation, but is faced with a denial of any additional compensation from the State of Arizona on the basis that the additional expense caused by the muddy conditions was not "extra work" within the meaning of the subcontract provisions. While it is possible that Roberts & Sons may be able to obtain a reversal of the denial of additional compensation by the Arizona Department of Transportation by litigation in Arizona, conflicting results in the two states are obvious and probable. If Beco's claim had been required to be brought in Arizona courts, Roberts & Sons could have impleaded the State of Arizona Highway Department, and consistent decisions reached. If Beco's additional effort was in fact "extra work" within the meaning of the subcontract provisions, then absent a waiver caused by failure to give timely written notice, Beco's claim against Roberts & Sons would have caused liability to flow through Roberts to the Arizona Department of Highways by virtue of a third party claim. However, here Roberts & Sons is faced with conflicting and contrary decisions. For purposes of its obligation to Beco, the additional effort was "extra work" for which the Idaho courts have held Roberts & Sons liable. However, for purposes of obtaining additional compensation from the State of Arizona for that "extra work," Roberts & Sons has been denied any additional compensation. These conflicting results point out why the Idaho courts should not have exercised jurisdiction over the defendant Roberts & Sons because of a lack of minimum contacts to satisfy due process. The prospects of conflicting decisions in these two states only enhance the lack of "fair play and substantial justice" which the due process clause guarantees.

---

12. Regarding the 10–day notice provision, defendant testified:

"Q. Mr. Fuller talks about written notice. In Article 14 of the contract, Ed, I find this provision: 'Any claim of the subcontractor for extra work and/or materials not so authorized or for damages of any nature whatsoever shall be deemed waived by the subcontractor unless written notice thereof is given to the contractor within ten days after the date of origin.' Did you ever receive any such written notice?

"A. No."

Likewise, plaintiff also testified:

"Q. [By Mr. L. Webb] There's a provision in that subcontract that requires you to give notice in writing within ten days of the origin of any extra work. Did you ever give any notice in writing within ten days of the origin of any of that extra work?

"A. [By Mr. Doyle Beck] Well, I would consider the work orders we had given them and had them sign would be written notice. We give them all kinds of verbal notice.

"Q. The only claim or notice of claim however that you ever served on them was the summary which is in evidence as Exhibit 9?

"A. I believe so, yes.

"Q. And that, of course, is dated February 14, 1984?

"A. Okay."

For the foregoing reasons, the district court erred in failing to grant Roberts & Sons' motion to dismiss for lack of jurisdiction. Furthermore, under the contract provisions, Roberts & Sons was not liable to Beco for any additional compensation under the subcontract, and the trial court should have granted Roberts & Sons' motions, either for directed verdict or for judgment notwithstanding the verdict.