188 P.3d 867

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Kanay Aongola MUBITA, Defendant–Appellant.**

**No. 33252.**

Supreme Court of Idaho, Boise, February 2008 Term.

June 11, 2008.

---

Molly J. Huskey, State Appellate Public Defender, Boise, for appellant. Elizabeth Ann Allred argued.

Honorable Lawrence G. Wasden, Attorney General, Boise, for respondent. Daniel W. Bower argued.

J. JONES, Justice.

A jury convicted Kanay Mubita on eleven counts of transferring body fluid which may contain the human immunodeficiency virus (HIV), pursuant to I.C. § 39–608. The district court imposed a unified sentence of four years, with four months fixed, for each count, to be served consecutively. Mubita appealed to this Court, asserting: the district court erred when it denied his motion to suppress certain medical records; the district court erred when it admitted two laboratory reports concerning his HIV status; it is factually impossible to violate the purposes of I.C. § 39–608 through oral-genital contact; and the district court's jury instruction pertaining to his affirmative defense was improper and violative of his right to due process. We affirm.

## I.

## BACKGROUND

Kanay Mubita immigrated to the United States from Zambia, Africa, and relocated in Moscow, Idaho. As part of an immigration physical, Dr. Larry Dean Harries executed an Immigration and Naturalization Service (INS) form on April 30, 2001, indicating that Mubita tested negative for the HIV antibody. Dr. Harries conducted this examination as part of a three-part examination, the results of which were to be forwarded in a sealed envelope to the INS.[1] Pursuant to the INS procedure, Dr. Harries sent the results in the sealed envelope to Mubita. The instructions included with the forms direct that the patient keep the envelope sealed and forward it directly to the INS. Dr. Harries testified at trial that he never directly informed Mubita his test results were negative for the HIV antibody.

On December 26, 2001, Mubita accompanied his then-wife to a hospital in Pullman, Washington, and submitted to another HIV test. This test came back with a positive result. Dr. Timothy Moody informed Mubita of these results by telephone and arranged a second test to determine the progression of the virus. In January 2002, Mubita submitted to the follow-up test, which also produced a positive result for HIV antibodies. Dr. Moody reported Mubita's positive HIV test results to the Whitman County (Washington) Public Health Department.

Following these test results, Mubita requested services from the North Central District Health Department (Health Department) in Moscow, Idaho, and began receiving HIV-related services. In order to receive these services, Mubita had to show he was in fact HIV positive. The first face-to-face meeting between Mubita and his caseworker, Jenny Ruppel, occurred on January 17, 2002.[2] As part of the intake process, Mubita executed a number of documents in January and February 2002, certifying his HIV positive status, including a Ryan White Care Act Intake Form, and a Ryan White Title II Care Act Client Rights and Responsibilities form. The latter form indicates that a participant has the right to have information released only in the following circumstances: (a) when the participant signs a written release of information, (b) when there is a medical emergency, (c) when there is a clear and immediate danger to the participant or others, (d) when there is possible child or elder abuse, or (e) when ordered by a court of law. Mubita also signed a document containing the text of I.C. § 39–608 and stating

---

1. Dr. Harries testified at trial that he made a mistake in reading the lab results. Dr. Harries mistakenly believed a test for Chlamydia and Gonorrhea was an HIV test, which mistake was not discovered until the time of trial. In fact, there was no HIV test conducted at the time.

2. The alleged sexual contacts, upon which the charges against Mubita are based, began in March 2002 and continued through December 4, 2005.

that he had read and understood such law.[3] Mubita executed a series of recertification forms, dated January 25, 2003, February 25, 2004, and January 11, 2005, all of which certify his HIV positive status. The record also contains an Authorization to Coordinate Services, executed by Mubita on July 30, 2002. This document provides, "[t]his authorization does not permit the release of any client records or files without my expressed written consent."

As part of the Health Department's HIV-related services, Ruppel helped Mubita gain financial assistance for transportation, housing, rental assistance and food. In addition, Ruppel helped Mubita set up doctor visits and obtain prescriptions. Specifically, Ruppel accompanied Mubita to see a doctor on May 11, 2005, and to consult a specialist in November 2005. Both doctors prescribed HIV medications for Mubita. Ruppel discussed the purpose, use, and function of these medications with Mubita. Ruppel testified at trial that she had had numerous discussions with Mubita regarding his HIV status during the time he utilized Health Department services. She testified that Mubita never said, or acted like, he didn't have HIV.

In early October 2005, someone notified the Latah County Prosecutor's Office that "a Moscow male who is HIV positive was believed to have had sexual activity with two women without informing them of his status."[4] In response to this information, the prosecutor's office sent a letter to the Health Department, requesting disclosure of "whatever information your agency may possess in regard to an adult male resident of Latah County who has tested positive for the HIV virus and who is believed to have engaged in sexual activity with two females in violation of Idaho Code 39–608 . . ." The letter indicated the request was made for "the purposes of a law enforcement investigation into whether a violation of I.C. § 39–608 has occurred." In addition, the prosecuting attorney requested whatever information the agency possessed regarding the identification of potential victims. The Health Department responded on October 17, 2005, attaching the documents at issue here.[5] The prosecutor's office forwarded the information to the Moscow Police Department on December 5.

After receiving the information from the prosecutor's office, police officers contacted Mubita by telephone and asked him to come in for an interview. Mubita voluntarily went to the police station to talk with the officers on December 6, 2005. At the station, the officers informed Mubita that he was not under arrest and was free to leave at any time. During the interview, Mubita denied receiving any paperwork demonstrating his HIV positive status. Mubita admitted that he knew T.A., one of the suspected victims, and that he had had unprotected sexual intercourse with her. In addition, Mubita stated he believed her child was his. Mubita initially denied knowing another victim, E.C., but later admitted to knowing her through T.A. Mubita denied having sexual intercourse with E.C., stating that he only had sexual relations with T.A. and his wife. While watching the interview on a closed-circuit television system, Detective Kwiatkowski phoned the director of the Health Department to inquire about Mubita's HIV status. The director told him Mubita had been informed of his HIV status and had signed a number of documents acknowledging his sta-

---

**3.** I.C. § 39–608(1) provides, in pertinent part:
Any person who . . . knowing that he or she is or has been afflicted with acquired immunodeficiency syndrome (AIDS), AIDS related complexes (ARC), or other manifestations of human immunodeficiency virus (HIV) infection, transfers or attempts to transfer any of his or her body fluid, body tissue or organs to another person is guilty of a felony and shall be punished by imprisonment in the state prison for a period not to exceed fifteen (15) years, by fine not in excess of five thousand dollars ($5,000), or by both such imprisonment and fine.

**4.** Nothing in the record indicates who provided the prosecutor's office with this information.

**5.** The documents showed that Mubita tested positive for HIV twice, and that he acknowledged his HIV status in order to receive financial assistance. These documents were State's exhibits at trial, and included two laboratory reports, the Ryan White Care Act forms, the I.C. § 39–608 acknowledgement form, and the recertification forms.

tus. At the interview, after Kwiatkowski showed him the documents from the Health Department, Mubita admitted to signing the documents. However, Mubita continued to deny having knowledge of his HIV status, stating that he was never given copies of the documents.

On December 7, Mubita called Ruppel. During the conversation, Ruppel became concerned for his well-being, and contacted the Moscow Police Department to request that it perform a welfare check. Kwiatkowski received the call and asked Ruppel whether Mubita was HIV positive and whether he knew of his HIV status prior to September 2004. Ruppel said he was HIV positive, that he had been told so numerous times, and that he had been receiving financial aid as a direct result of his HIV status. Three officers, one in uniform, went to Mubita's home to perform the welfare check after receiving the phone call from Ruppel. The officers knocked on the door and asked Mubita if they could come inside and talk. Mubita let them in the house. Kwiatkowski told Mubita he had spoken with Ruppel and that she was worried about his well-being. Mubita did not appear to be upset. Kwiatkowski informed Mubita he had talked to Ruppel about his HIV status, and asked whether he knew he was HIV positive. Mubita responded that he knew he was HIV positive. Based on the interview the night before, wherein he disclosed having unprotected sex with T.A., and the information from Ruppel, Kwiatkowski placed Mubita under arrest.

The police department subsequently issued a press release regarding the arrest, asking people who may have had sexual contact with Mubita to contact the department. The police department interviewed 13 potential victims from December 9 through December 30, 2005.

Mubita was charged with a total of eleven counts of violating I.C. § 39–608. Mubita pleaded not guilty to all counts. Prior to trial, Mubita filed two motions—a motion to change venue, which the district court denied,[6] and a motion to suppress, which is at issue in this appeal. In his motion to suppress, Mubita sought suppression of any in-

formation or documents released by the Health Department, as well as any statements Mubita made to law enforcement officials. The district court denied his motion to suppress with regard to the information and documents released by the Health Department and the statements made to Kwiatkowski prior to his arrest, but granted the motion to suppress statements made during the booking process.

A trial was held in late March 2006, and the jury found Mubita guilty of all eleven counts. The district court imposed a unified sentence of four years, with four months fixed, for each count, to be served consecutively. Mubita filed a timely appeal.

## II.

## DISCUSSION

The following issues are presented for determination: (1) whether the district court erred when it denied Mubita's motion to suppress documents released by the Health Department to the prosecutor's office; (2) whether the district court erred when it admitted the two lab reports under the business records exception to the hearsay rule; (3) whether it is factually impossible to violate I.C. § 39–608 by oral-genital contact; and (4) whether the district court violated Mubita's due process rights when it added language to his requested jury instruction regarding his affirmative defense.

### A.

**The District Court Did Not Err When it Denied Mubita's Motion to Suppress Documents the Health Department Released to the Prosecutor's Office**

█ In reviewing an order granting or denying a motion to suppress evidence, this Court will defer to the trial court's factual findings unless clearly erroneous. *State v. McCall*, 135 Idaho 885, 886, 26 P.3d 1222, 1223 (2001). However, the Court exercises free review over a trial court's determination as to whether the district court satisfied con-

6. Mubita does not appeal this decision.

stitutional requirements in light of the facts found. *Id.*

Mubita argues his Fourth Amendment rights were violated when his health records were "seized" from the Health Department by the prosecutor. He asserts that the privacy of health records, which pertain to the intimate details of a person's life, is of fundamental importance in American society because it encourages individuals to trust and confide freely in medical professionals. Mubita bases his Fourth Amendment argument primarily upon the grounds that the Health Department released information in violation of the Standards for Privacy of Individually Identifiable Health Information (HIPAA Standards), 45 C.F.R. §§ 164.500–534.[7] According to Mubita, statutes like HIPAA show that he does indeed have a privacy interest in his medical records. Therefore, any disclosure of his medical records not made in accordance with the law is a violation of the Fourth Amendment and should result in suppression of the records. Further, Mubita claims the Health Department informed him that the records would be released only in certain specified circumstances. Therefore, he had a legitimate expectation that the records would remain private, and he reasonably expected the documents would not be released without his consent. In sum, Mubita argues the Fourth Amendment and Article 1 § 17 of the Idaho Constitution "specifically protect" against the unauthorized disclosure of his confidential papers. Such disclosure of confidential papers by a government actor[8] violated his Fourth Amendment right to be free from unreasonable search and seizure.

The State asserts the district court correctly held that Mubita lacked standing to assert a search and seizure violation with regard to his health records because he voluntarily released the records to a third party. The State relies upon *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), and *State v. Kluss*, 125 Idaho 14, 867 P.2d 247 (Ct.App.1993), to argue that Mubita had no legitimate expectation of privacy in information he voluntarily turned over to a third party. The State points out that Mubita voluntarily turned over the laboratory results in order to obtain the Health Department's HIV-related services. The additional documents that Mubita executed to obtain Health Department services were the Health Department's own records. As such, he has no standing to claim a Fourth Amendment violation based on the Health Department's disclosure of these records.

■ The Fourth Amendment guarantees the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. U.S. Const. amend. IV. Art. 1 § 17 of the Idaho *Constitution is substantially similar.* Although this Court is free to interpret the Idaho Constitution as more protective of the rights of Idaho citizens than the U.S. Supreme Court's interpretation of the federal constitution, it seriously considers federal law in determining the parameters of Idaho's constitutional provisions. *State v. Holton,* 132 Idaho 501, 503 n. 1, 975 P.2d 789, 791 n. 1 (1999) (citing *State v. Guzman,* 122 Idaho 981, 988, 842 P.2d 660, 667 (1992)).

■ "The Fourth Amendment's proper function is to constrain, not against all intrusions, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." *Holton,* 132 Idaho at 503, 975 P.2d at 791 (quoting *Schmerber v. State of California,* 384 U.S. 757, 768, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908, 918 (1966)). Similarly, the purpose of Art. 1 § 17 is to protect Idaho citizens' reasonable expectation of privacy against arbitrary government intrusion. *Holton,* 132 Idaho at 503, 975 P.2d at 791. Thus, the question in determining whether a search violates the Fourth Amendment's prohibition on unreasonable searches and seizures is whether one has a reasonable expectation of privacy in the subject of the search. The U.S. Supreme Court has summarized the rule as follows:

> [T]he application of the Fourth Amendment depends on whether the person in-

---

**7.** Promulgated pursuant to HIPAA, the Health Insurance Portability and Accountability Act of 1996. Pub.L. No. 104–191, 110 Stat.1936 (Aug. 21, 1996).

**8.** The parties do not dispute his contention that the Health Department is a government actor.

voking its protection can claim a "justifiable," a "reasonable," or a "legitimate expectation of privacy" that has been invaded by government action. This inquiry ... normally embraces two discrete questions. The first is whether the individual, by his conduct, has "exhibited an actual (subjective) expectation of privacy,"—whether ... the individual has shown that "he seeks to preserve [something] as private." The second question is whether the individual's subjective expectation of privacy is "one that society is prepared to recognize as 'reasonable,'"—whether ... the individual's expectation, viewed objectively, is "justifiable" under the circumstances.

*Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220, 226–27 (1979) (internal citations omitted).

In order to prevail on his claim, Mubita must first demonstrate he has a protectable Fourth Amendment interest in the subject of the search. The State asserts Mubita failed to do so, citing *United States v. Miller*. There, the U.S. Supreme Court stated the general rule that one does not have a Fourth Amendment interest in information he voluntarily turns over to third parties:

> This Court has repeatedly held that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

425 U.S. at 443, 96 S.Ct. at 1624, 48 L.Ed.2d at 79. Miller sought suppression of his bank records, which two banks had turned over in response to defective grand jury subpoenas. *Id.* at 436–37, 96 S.Ct. at 1621, 48 L.Ed.2d at 75–76. The U.S. Supreme Court upheld the district court's denial of his motion to suppress, finding there was no intrusion into any

area in which respondent had a protected Fourth Amendment interest. *Id.* at 440, 96 S.Ct. at 1622–1623, 48 L.Ed.2d at 77. The documents at issue were business records of the banks, rather than respondent's private papers. *Id.* In reaching this conclusion, the Court noted the bank itself was a party to these transactions, with a substantial stake in the continued availability and acceptance of the records. *Id.* at 440–41, 96 S.Ct. at 1623, 48 L.Ed.2d at 77–78. The Court declined to find Miller had a protectable interest in the documents because "[a]ll of the documents obtained, including financial statements and deposit slips, contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business." *Id.* at 442, 96 S.Ct. at 1623, 48 L.Ed.2d at 78–79. Applying the rule stated above, the Court noted the bank customer "takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government." *Id.* at 443, 96 S.Ct. at 1624, 48 L.Ed.2d at 79 (citing *United States v. White*, 401 U.S. 745, 751–52, 91 S.Ct. 1122, 1126, 28 L.Ed.2d 453, 458–59 (1971)). Therefore, Miller had no protectable Fourth Amendment interest in the documents.

■ This case is analogous. Mubita turned the laboratory reports over to the Health Department in order to obtain HIV-related services. Applying *Miller*, he thereby "assumed the risk" the documents could be further disclosed.[9] The additional documents are the Health Department's own forms, which Mubita executed in order to receive the desired services. These are not medical records, containing information he revealed to his own physician in order to obtain medical treatment, but rather business records maintained by the Health Department to administer its HIV services. Like Miller, Mubita has no protectable Fourth Amendment interest in such documents.[10] *See also United States v. Jacobsen,*

9. Mubita cites no authority to support his contention that medical records are treated differently under Fourth Amendment jurisprudence.

10. Mubita also argues the HIPAA Standards create an expectation of privacy in the records. *U.S. v. Miller* answers this question. The re-

spondent in *Miller* argued the Bank Secrecy Act created a Fourth Amendment interest in the depositor, even though there was otherwise no protectable Fourth Amendment interest. *Miller*, 425 U.S. at 441, 96 S.Ct. at 1623, 48 L.Ed.2d at 78. The Supreme Court declined to adopt such a rule. The Court noted, "The lack of any

466 U.S. 109, 117, 104 S.Ct. 1652, 1658, 80 L.Ed.2d 85, 96–97 (1984) (the Fourth Amendment is implicated only with respect to that which the expectation of privacy has not already been frustrated; when an individual reveals private information to another, he assumes the risk his confidant will reveal that information to the authorities); *SEC v. O'Brien,* 467 U.S. 735, 743, 104 S.Ct. 2720, 2725–26, 81 L.Ed.2d 615, 622 (1984) (SEC not constitutionally required to notify "targets" of nonpublic investigation into possible violations of the securities laws when the SEC issues subpoenas to third parties); *Donaldson v. United States,* 400 U.S. 517, 522, 91 S.Ct. 534, 538, 27 L.Ed.2d 580, 584 (1971) (Internal Revenue summons directed to third party does not entrench upon any interests protected by the Fourth Amendment); *Couch v. United States,* 409 U.S. 322, 335–36, 93 S.Ct. 611, 619, 34 L.Ed.2d 548, 558 (1973) (no expectation of privacy where records are handed to an accountant, knowing that mandatory disclosure of much of the information is required).

Mubita does not base his claim solely on the federal constitution, recognizing this Court has extended protections under Art. 1 § 17 beyond the Supreme Court's interpretation of the Fourth Amendment. The U.S. Supreme Court applied the rule in *Miller* to the installation and use of a pen register in *Smith v. Maryland.* The Court reiterated that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties. "When he used his phone, petitioner voluntarily conveyed numerical information to the telephone company and 'exposed' that information to its equipment in the ordinary course of business. In so doing, petitioner assumed the risk that the company would reveal to police the numbers he dialed." 442 U.S. at 744, 99 S.Ct. at 2582, 61 L.Ed.2d at 229. Thus, Smith probably entertained no actual expectation of privacy in the phone numbers. *Id.* at 745, 99 S.Ct. at 2583, 61 L.Ed.2d at 230. Even if he

did entertain such an expectation, this expectation was not reasonable. *Id.*

In *State v. Thompson,* 114 Idaho 746, 760 P.2d 1162 (1988), this Court declined to follow *Smith,* holding instead that the use of a pen register constituted a search under Art. 1 § 17 of the Idaho Constitution, and that the evidence produced by the pen register should not have been considered in the issuance of wiretap orders. 114 Idaho at 747, 760 P.2d at 1163. In reaching this conclusion, this Court reaffirmed its rule that "in interpreting provisions of our constitution that are similar to those of the federal constitution we are free to extend protections under our constitution beyond those granted by the United States Supreme Court under the federal constitution." *Id.* at 748, 760 P.2d at 1164. The Court continued to hold that there is a legitimate and reasonable expectation of privacy in the phone numbers that are dialed in Idaho, adopting the reasoning of the dissenters in *Smith. Id.* at 751, 760 P.2d at 1167.

However, we have limited the scope of *Thompson* in subsequent cases. For example, in *State v. Donato,* 135 Idaho 469, 470–71, 20 P.3d 5, 6–7 (2001), the defendant argued Art. 1 § 17 provided greater protection of his privacy rights than the U.S. Constitution, and that a search of his garbage was therefore invalid under the Idaho Constitution. We distinguished *Thompson* and its progeny:

> [I]n these cases, we provided greater protection to Idaho citizens based on the uniqueness of our state, our Constitution, and our long-standing jurisprudence. None of these factors support a divergence from the interpretation of the Fourth Amendment by the United States Supreme Court in this case.

*Id.* at 472, 20 P.3d at 8. Thus, the Court applied U.S. Supreme Court precedent to find the defendant had no reasonable expec-

---

legitimate expectation of privacy concerning the information kept in bank records was assumed by Congress in enacting the Bank Secrecy Act, the expressed purpose of which is to require records to be maintained...." *Id.* at 442–43, 96 S.Ct. at 1623–24, 48 L.Ed.2d at 79. Thus, the Bank Secrecy Act did not alter the Fourth

Amendment analysis. Since the Supreme Court declined to hold in *Miller* that the mandates of such a statute can create Fourth Amendment standing, and Mubita cites no authority for such a holding, we conclude that HIPAA does not itself create a protectable Fourth Amendment interest in the documents.

tation of privacy in the garbage left out for collection. *Id.* at 474, 20 P.3d at 10.

*Donato* and *Miller* control the outcome of this case. As per *Donato*, Mubita cites nothing that would support a divergence from the U.S. Supreme Court's interpretation of the Fourth Amendment in this case. In fact, the State cites an analogous case, where the Court of Appeals applied *Miller* to the disclosure of public utility records. *Kluss*, 125 Idaho 14, 867 P.2d 247. In that case, Kluss argued the police officer violated both the state and federal constitutions in obtaining records of a utility company showing the monthly power consumption on his property. *Id.* at 19, 867 P.2d at 252. The court looked to *Miller* and *Thompson* to determine whether the disclosure of these records violated Kluss' rights under Art. 1 § 17 of the Idaho Constitution. *Id.* The court ultimately applied the rule from *Miller*, finding that the scope of Art. 1 § 17's protection does not extend to the individual power consumption records maintained by a utility. *Id.* at 21, 867 P.2d at 254. "We do not view any such expectation of privacy in those records as being objectively reasonable." *Id.* "If, as a matter of policy, a utility chooses to voluntarily disclose such information to a law enforcement officer without a subpoena issued under either I.C.R. 17(b) or I.C. § 37–2741A, that disclosure is lawful, and there is neither any statutory nor constitutional basis for suppression of the evidence so obtained." *Id.* For the reasons herein stated, we believe *Miller* controls the outcome of the present case.

Additionally, it is worth noting that HIV is a reportable disease, and statutes and regulations specifically provide for disclosure of public health records where HIV is at issue. *See* I.C. § 39–610 (authorizing certain disclosure of HIV information); I.C. § 39–606 (reports to director of health and welfare shall be made with the name of patient being treated for such disease); I.C. § 39–609 (declaration of legislative policy that reporting of HIV to public health officials is essential). Regulations specifically require reporting of HIV, which reports include the identity and address of the attending physician and the name, current address, telephone number and birth date or age, race, ethnicity, and sex

of the individual. *See* IDAPA 16.02.10.010. (now IDAPA 16.02.10.040. and 050. under revised regulations implemented on April 2, 2008). The Department of Health and Welfare is charged with a duty to investigate reportable diseases, including HIV. IDAPA 16.02.10.015.01.a. (now IDAPA 16.02.10.065.01) (Department shall use all reasonable means to confirm in a timely manner any case or suspected case and shall determine all sources of infection and extent of exposure). Any person who may have been exposed to the disease must provide contact information of all persons from whom the disease may have been acquired. IDAPA 16.02.10.015.10 (now IDAPA 16.02.10.065.10). The HIPAA Standards, which Mubita cites to support his contention that he has a right to privacy in these documents, also provide for disclosure if the covered entity believes it is necessary to prevent a threat to the health or safety of the public. *See* 45 C.F.R. § 164.512(j)(1). Further, Mubita executed the Ryan White Title II Care Act Client Rights and Responsibilities form, which indicates that "a participant has the right to have information released only in the following circumstances: ... (c) when there is a clear or immediate danger to you or others." In this instance, Mubita created a clear and immediate danger to public health, allowing for release of the records that he voluntarily turned over to, or created with, the Health Department.

## B.

### The Health Department Complied with HIPAA Standards for Privacy of Individually Identifiable Health Information

■ Mubita also argues the records should be suppressed on the ground that the Health Department's release of his medical records violated the HIPAA Standards. Mubita cites 45 C.F.R. § 164.512 to support his argument that the disclosure violated those standards. Under section 164.512(e), disclosure requires either a court order, or a subpoena or discovery request, along with notice to Mubita to allow him to object. In addition, Mubita points to section 164.512(f)

governing disclosure for law enforcement purposes. Under this section, Mubita again argues there was no court order or subpoena, nor any administrative request that would allow the Health Department to disclose his information. Mubita argues section 164.512(f)(1)(ii)(C) requires that the information requested be specific and limited in scope. Since the prosecutor here requested "whatever information your agency may possess" in regard to an adult male resident of Latah County who has tested positive for the HIV virus, he argues the request was not specific. Lastly, Mubita points to section 164.512(f)(2), which covers disclosures for identification and location purposes. Again, Mubita argues the prosecutor's request was too broad. The State claims its actions were consistent with the HIPAA Standards. In the alternative, the State contends that the exclusionary rule does not apply to a statutory violation.[11]

Under 45 C.F.R. § 164.502, the general rule is that a covered entity may not use or disclose protected health information, except as specifically permitted. Section 164.512 sets forth specific instances where a covered entity may disclose protected health information without the written consent, authorization or notice to the individual. Section 164.512(f) sets forth the standard for disclosures to law enforcement officials for law enforcement purposes.[12] Subsection (f)(1)(ii)(C) permits such disclosures in compliance with "an authorized investigative demand, or similar process authorized by law," provided that: (1) the information sought is relevant and material to a legitimate law enforcement inquiry; (2) the request is specific and limited in scope to the extent reasonably practicable in light of the purpose for which the information is sought; and (3) de-identified information could not reasonably be used.

The prosecutor explicitly requested the documents pursuant to 45 C.F.R. § 164.512(f)(1)(ii)(C). The State met the requirements of this section in making its request for disclosure. The request was an authorized investigative demand made by the county prosecutor, which demand was material to a law enforcement inquiry. The request was specific and limited in scope to the extent reasonably practicable in light of the purpose for which the information was sought. Finally, de-identified information was not a possibility because the identification and confirmation of Mubita's HIV status was necessary to preclude any additional victims. Based on these factors, enumerated in section 164.512(f)(1)(ii)(C), the State complied with HIPAA Standards.[13]

 Furthermore, it should be noted that, even if the State had violated HIPAA Standards, suppression of the evidence is not the proper remedy for a HIPAA violation. *See, e.g., Sanchez–Llamas v. Oregon*, 548 U.S. 331, 126 S.Ct. 2669, 165 L.Ed.2d 557 (2006) (suppression is not a proper remedy for violation of the Vienna Convention, art. 36); *United States v. Frazin*, 780 F.2d 1461, 1466 (9th Cir.1986) (no suppression for violation of Right to Financial Privacy Act) ("Because the statute, when properly construed, excludes a suppression remedy, it would not be appropriate for us to provide one in the

11. Mubita also argues subsection (f)(2) of section 164.512 prohibits the disclosure of information related to the individual analysis of body fluids. Thus, the State could not have properly requested information regarding HIV status. However, the State's request was made pursuant to subsection (f)(1), and the mandates of subsection (f)(2) pertain to disclosures for identification and location purposes. The regulations separate the (f)(1) requirements from the (f)(2) requirements. "Except for disclosures required by law as permitted by paragraph (f)(1)...." Thus, this prohibition is inapplicable to the State's request.

12. Law enforcement official means an officer of any agency or authority of the United States or a state who is empowered by law to investigate or

conduct an official inquiry into a potential violation of the laws; or prosecute or otherwise conduct a criminal, civil, or administrative proceeding arising from an alleged violation of law. 45 C.F.R. § 164.501.

13. Further, there are additional provisions by which the State could have requested the information sought. For example, section 164.512(j) permits disclosure if the covered entity, in good faith, believes the use or disclosure is necessary to prevent or lessen a serious and imminent threat to the health or safety of a person or the public and is to a person reasonably able to prevent or lessen the threat. 45 C.F.R. § 164.512(j)(1)(i). The situation here clearly fits within these standards.

exercise of our supervisory powers over the administration of justice. Where Congress has both established a right and provided exclusive remedies for its violation, we would 'encroach upon the prerogatives' of Congress were we to authorize a remedy not provided for by statute."). HIPAA expressly provides for monetary fines in the event of a violation. *See* 42 U.S.C.A. §§ 1320d–5, 1320d–6. Thus, the proper remedy for a HIPAA violation is a monetary fine, consistent with the express provisions of the statute.[14] The district court did not err when it denied Mubita's motion to suppress the documents based on the alleged HIPAA violation.

## C.

**The Laboratory Results Were Not Properly Admitted Under the Business Records Exception, But the Error Was Harmless**

■■■■ Mubita asserts the district court erred in admitting laboratory reports over his objection because the reports contained hearsay. The State asserts any hearsay included within the documents was properly admitted pursuant to the business records exception. The trial court has broad discretion whether to admit hearsay under one of the exceptions, and we will not overturn the exercise of that discretion absent a clear showing of abuse. *State Dept. of Health & Welfare v. Altman,* 122 Idaho 1004, 1007, 842 P.2d 683, 686 (1992) (quoting *Cheney v. Palos Verdes Inv. Corp.,* 104 Idaho 897, 900, 665 P.2d 661, 664 (1983)). When an exercise of discretion is reviewed on appeal, the Court inquires: (1) whether the lower court rightly perceived the issue as one of discretion; (2) whether the court acted within the boundaries of such discretion and consistently with any legal standards applicable to specific choices; and (3) whether the court reached its decision by exercise of reason. *State v. Perry,* 139 Idaho 520, 522, 81 P.3d 1230, 1232 (2003).

■■■■■ Hearsay is a statement, other than one made by the declarant while testify-

ing at trial, offered in evidence to prove the truth of the matter asserted. Idaho R. Evid. 801(c). As a general rule, hearsay is excluded unless the proffered evidence falls within an exception to the rule. Idaho R. Evid. 802. Under Idaho R. Evid. 803(6), business records are not excluded by the hearsay rule. The rule provides in pertinent part:

> **Records of regularly conducted activity.** A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

The scope of the business records exception is broad. *Christensen v. Rice,* 114 Idaho 929, 933, 763 P.2d 302, 306 (Ct.App.1988). It permits the admission of hearsay statements in business records although the opposing party has no opportunity to cross-examine the author of the record at trial. *Id.* "Business records possessing a reasonable degree of necessity and trustworthiness are to be received in evidence unless the trial court, after examination, doubts their reliability." *Id.* at 934, 763 P.2d at 307 (quoting *Idaho Falls Bonded Produce and Supply Co. v. Gen. Mills Rest. Group, Inc.,* 105 Idaho 46, 49, 665 P.2d 1056, 1059 (1983)). Business records are admissible even though they contain minor alterations. *Christensen,* 114 Idaho at 933, 763 P.2d at 306.

■■■■ Records sought to be admitted under the business records exception need not be authenticated by the person who made the records, but it is necessary that the records be authenticated by a person who has custody of the record as a regular part of his or her work or who has supervision of its cre-

---

14. It should be noted that any fine would be levied against the person or entity maintaining and releasing the records, as that is the focus of HIPAA, not the third party requesting the records.

ation. *Henderson v. Smith*, 128 Idaho 444, 450, 915 P.2d 6, 12 (1996) (quoting *Altman*, 122 Idaho at 1007–08, 842 P.2d at 686–87). The custodian need not have personal knowledge of the actual creation of the document when the record was made. *Henderson*, 128 Idaho at 450, 915 P.2d at 12.

■ Mubita asserts the State failed to lay proper foundation because Dr. Moody was unsure where the blood sample was taken, either at his clinic, Palouse Medical, or at the hospital laboratory. In addition, Mubita argues the lab reports are hearsay, and do not fit within any recognized exception. He argues the documents fail to meet the business records exception because the State offered no evidence that it was a regularly conducted activity of Dr. Moody to "make" laboratory results. The State counters that both the foundational issue and the hearsay issue are settled by the business records rule. According to the State, Dr. Moody properly authenticated the lab results when he testified he had custody of the records as a regular part of his work and that the records were kept in the regular course of his work.

On the one hand, Mubita's point is well taken. Rule 803(6) does speak of the business activity making the document. The Court of Appeals, relying upon this rule, has declined to allow the admission of business records through the testimony of someone other than the person who made them. *See, e.g., In the Interest of S.W.*, 127 Idaho 513, 520, 903 P.2d 102, 109 (Ct.App.1995); *State v. Hill*, 140 Idaho 625, 628, 97 P.3d 1014, 1017 (Ct.App.2004). On the other hand, the rule, as written, does not take into account the increasingly complex manner in which business is conducted today in the medical profession. While in the past, doctors may have had their own employees perform lab tests and make their own reports, that type of practice is no longer commonplace due to increased specialization within the medical profession. Doctors increasingly utilize the services of independently contracting labs, technicians and specialists to perform analyses of body fluids and tissues, body scans, and the like. The physician acts as the contact with the patient to identify symptoms and arrive at a tentative diagnosis; but the physician often must farm out a variety of tasks to technicians and specialists in order to get the detailed information upon which to continue his work in finalizing the diagnosis and treating the patient. The doctor determines which tests the patient needs and then requests the appropriate technicians or specialists to perform the same and report back the results, which he or she then uses in treating the patient. Such reports are the composite of the efforts of a number of individuals or entities, but they end up in the final analysis in the doctor's file. Those reports are, and must be, trustworthy because life or death treatment decisions are necessarily based upon them. The defendant presented no evidence in this case to indicate that the lab reports requested, received, and used by Dr. Moody were not trustworthy. On the other hand, the initial INS report, prepared by Dr. Harries' own hand, was incorrect and obviously untrustworthy.

We have yet to directly address the question of whether a lab report requested and used by a physician, but which he did not actually "make," qualifies for the business records exception. The Court did consider the rationale for admission of hospital records in *Altman*, where the Court stated:

> Where (as here) the trial court is satisfied that sufficient testimony has been adduced regarding the manner in which certain records have been kept and that their identity has been properly established in compliance with the act,[15] no objection on the ground of hearsay can be entertained. As applied to hospital rec-

---

15. The Act referred to here is the Uniform Business Records as Evidence Act, which was enacted in Idaho in 1939. 1939 Idaho Sess. Laws, ch. 106, § 2, p. 175, currently I.C. §§ 9–415–417. A more specific act pertaining to hospital records— the Uniform Photographic Copies of Business Records as Evidence Act—was enacted in 1951. 1951 Sess. Laws, ch. 173, § 3, p. 368, currently I.C. §§ 9–418–420. Neither party has asserted the application of either of these acts to the case at hand so we do not opine as to their applicability. Neither has either party addressed the issue of whether the laboratory reports would be admissible under Idaho R. Evid. 803(24), the catch-all provision of the hearsay exception, and we therefore decline to consider the applicability of that provision.

ords, compliance with the act obviates the necessity, expense, inconvenience and sometimes impossibility of calling as witnesses the attendants, nurses, physicians, X-ray technicians, laboratory and other hospital employees who collaborated to make the hospital record of the patient. *It is not necessary to examine the person who actually created the record* so long as it is produced by one who has the custody of the record as a regular part of [the person's] work *or has supervision of its creation.*

122 Idaho at 1008, 842 P.2d at 687 (quoting *Cantrill v. Am. Mail Line,* 42 Wash.2d 590, 257 P.2d 179, 189 (1953)) (first emphasis added). This rationale would fit the present case, where Dr. Moody testified that the documents sought to be admitted were standard laboratory forms he maintains in his records in the regular course of his business, that he receives and relies upon such records in the regular course of his medical practice, and that the records come from the clinic or the hospital laboratory in the regular course of his business. It would have been of little utility and of great inconvenience to summon each technician who examined Mubita's bodily fluid samples. Since Dr. Moody relied on these objective scientific findings for Mubita's course of treatment and never doubted their trustworthiness, neither should we.

Despite the foregoing considerations, Mubita's contention that the business records exemption does not apply because Dr. Moody did not actually "make" the laboratory results must be addressed. While we can see no good policy reason to exclude the laboratory reports, we are not comfortable stretching the definition of "make" to the point where we ignore its ordinary meaning. Thus, rather than trying to fit the situation of these medical records within the ambit of the current rule, we feel constrained by the language of the rule to concur with Mubita that the records were improperly admitted under Rule 803(6) because Dr. Moody's business did not make them. Thus, we find that, under the current language of the rule, the district court erred in admitting the laboratory reports.

▮▮▮▮ The State asserts that even if the district court erred in admitting the laboratory reports, such error was harmless. An error that does not affect the defendant's substantial rights is considered harmless and does not require reversal or a new trial. I.C.R. 52; *State v. Doe,* 137 Idaho 519, 527, 50 P.3d 1014, 1022 (2002). The test for harmless error is whether a reviewing court can find beyond a reasonable doubt that the jury would have reached the same result without the admission of the challenged evidence. *Id.* (quoting *State v. Moore,* 131 Idaho 814, 821, 965 P.2d 174, 181 (1998)). The State asserts the admission of the lab results would be harmless error because it presented additional evidence sufficient to prove Mubita's knowledge of his HIV status, including testimony by Health Department employees that he went through the process of applying for and obtaining HIV-related social services, and testimony by Dr. Moody that he informed Mubita of the positive test results. Thus, the Court can conclude beyond a reasonable doubt that the jury would have reached the same result even without the lab results. The State's argument is well-taken. There was overwhelming evidence presented at trial, in addition to the laboratory reports, which supports the jury's finding that Mubita knew he was infected with HIV. Thus, this Court concludes beyond a reasonable doubt that the jury would have convicted Mubita, even without the laboratory results.[16]

### D.

### Mubita Violated the Plain Language of I.C. § 39–608 by Engaging in Oral–Genital Contact

▮▮▮▮ Mubita asserts it was factually impossible for him to violate the intended purpose of I.C. § 39–608 with respect to D.W. because his contact with D.W. only involved oral-genital contact. Mubita points to the Legislature's statement of purpose in enact-

---

**16.** Mubita claims his Sixth Amendment rights were violated by virtue of not having the opportunity to confront and cross-examine those who actually performed the lab tests. However, since admission of the tests has been determined to be harmless error in any event, we need not address this claim.

ing I.C. § 39–608,—to make "it a felony to knowingly expose another person to AIDS." Statement of Purpose, H.B. 433, RS 21026C1, 49th Leg., 2d Sess. (Idaho 1988). Mubita relies on this statement of purpose to argue that, since the Legislature intended to criminalize behavior which may result in the spread of HIV or AIDS, and Mubita's behavior with D.W. could not have exposed her to HIV,[17] it was factually impossible to violate the statute's purpose. Mubita does not assert it was factually impossible to violate the statute as written, but only that it was factually impossible to violate the statute as intended. According to the State, Mubita's oral-genital contact with D.W. exposed her to the HIV virus based upon the plain language of the statute and is therefore precisely the kind of criminal behavior the statute was intended to proscribe. In so arguing, the State points out there is no authority for Mubita's proposition that policy can override the plain and unambiguous terms of a statute.

 The interpretation of a statute is a question of law over which this Court exercises free review. *State v. Thompson,* 140 Idaho 796, 798, 102 P.3d 1115, 1117 (2004). When construing a statute, the focus of the Court is to determine and give effect to the intent of the legislature. *George W. Watkins Family v. Messenger,* 118 Idaho 537, 539–40, 797 P.2d 1385, 1387–88 (1990). Judicial interpretation of a statute begins with an examination of the statute's literal words. *State v. Burnight,* 132 Idaho 654, 659, 978 P.2d 214, 219 (1999). Where the language of a statute is plain and unambiguous, this Court must give effect to the statute as written, without engaging in statutory construction. *State v. Rhode,* 133 Idaho 459, 462, 988 P.2d 685, 688 (1999). The language of the statute must be given its plain, obvious and rational meaning. *Burnight,* 132 Idaho at 659, 978 P.2d at 219. Unless the result is palpably absurd, this Court assumes the leg-

islature meant what is clearly stated in the statute. *Rhode,* 133 Idaho at 462, 988 P.2d at 688.

 Where ambiguity exists as to the elements or potential sanctions of a crime, this Court will strictly construe the criminal statute in favor of the defendant. *Rhode,* 133 Idaho at 462, 988 P.2d at 688. When the Court must engage in statutory construction, it has the duty to ascertain the legislative intent and give effect to that intent. *Id.* To ascertain the intent of the legislature, not only must the literal words of the statute be examined, but also the context of those words, the public policy behind the statute and its legislative history. *Id.*

In this case, we need not go beyond the plain language of the statute. I.C. § 39–608(1) provides:

Any person who exposes another in any manner with the intent to infect or, knowing that he or she is or has been afflicted with acquired immunodeficiency syndrome (AIDS), AIDS related complexes (ARC), or other manifestations of human immunodeficiency virus (HIV) infection, transfers or attempts to transfer any of his or her body fluid, body tissue or organs to another person is guilty of a felony and shall be punished by imprisonment in the state prison for a period not to exceed fifteen (15) years, by fine not in excess of five thousand dollars ($5,000), or by both such imprisonment and fine.

Further, I.C. § 39–608(2) defines "body fluid" to mean semen, blood, saliva, vaginal secretion, breast milk, and urine. "Transfer" is also expressly defined to include "engaging in sexual activity by genital-genital contact, oral-genital contact, anal-genital contact." I.C. § 39–608(2).

At trial, D.W. testified that she stayed with Mubita for approximately six nights in October 2005. During this time, Mubita performed oral sex on D.W., but they never

---

17. Mubita bases this assertion on a number of authorities demonstrating that contact with saliva has never been shown to result in transmission of HIV. The State counters with additional authority demonstrating oral sex could result in the transmission of HIV and asserts that Mubita's allegations have no factual basis. Both par-

ties acknowledge in their briefing that blood from the mouth may enter the body during oral sex, resulting in the transmission of HIV. None of these authorities are contained in the record below and are exclusively raised in the parties' briefing to this Court.

engaged in vaginal intercourse. Mubita never told D.W. about his HIV status. D.W. testified that there was some genital-genital contact in addition to oral sex, where Mubita stroked his penis on her clitoris. He ejaculated on her upper thigh. We must first look to the plain words of the statute to determine legislative intent. Here, the statute unambiguously dictates that one can "transfer" one's body fluid via "oral-genital contact," and the statute expressly defines "body fluid" to include saliva. Such a transfer violates the unambiguous terms of the statute. Thus, Mubita violated I.C. § 39–608 by engaging in oral-genital contact with D.W.

## E.

### Jury Instruction No. 20 Does Not Constitute Reversible Error; The District Court's Modification of the Language of the Statutory Defense Did Not Violate Mubita's Due Process Rights

Whether the trial court properly instructed the jury presents a question of law over which this Court exercises free review. *State v. Blake,* 133 Idaho 237, 239, 985 P.2d 117, 119 (1999) (quoting *State v. Row,* 131 Idaho 303, 310, 955 P.2d 1082, 1089 (1998)). The Court's review of jury instructions is "limited to a determination of whether the instructions, as a whole, fairly and adequately present the issues and state the law." *Garcia v. Windley,* 144 Idaho 539, 542–43, 164 P.3d 819, 822–23 (2007). "When the instructions, as a whole, do not mislead or prejudice a party, an erroneous instruction does not constitute reversible error." *Id.* The appellant has the burden to clearly show prejudicial error from an erroneous jury instruction. *Id.* An erroneous instruction is prejudicial when it could have affected or did affect the outcome of the trial. *Id.*

Mubita objected to Instruction No. 20 below, and asserts on appeal that the district court erred when it denied Mubita's requested instruction. First, Mubita asserts the district judge should have used his proposed instruction because it was a correct statement of the law, taken directly from Idaho Criminal Jury Instruction 982. I.C. § 39–608 provides two affirmative defenses:

consent and medical advice. Under I.C. § 39–608(3)(b), "it is an affirmative defense that the transfer of body fluid, body tissue, or organs occurred after advice from a licensed physician that the accused was noninfectious." The district court's jury instruction below provided:

> In this case, the law provides the defendant with an affirmative defense to the charges.
>
> It is an affirmative defense to each charge of transfer or attempted transfer of body fluid that it occurred after advice from a licensed physician that the defendant was noninfectious.
>
> In deciding upon the reasonableness of the defendant's beliefs, you should determine what an ordinary and reasonable person might have concluded from all the facts and circumstances which the evidence shows existed at that time.
>
> The burden is on the State to prove beyond a reasonable doubt that the defendant knew he was infectious at the time the attempted transfer of body fluid occurred. If there is a reasonable doubt whether the defendant knew he was infectious, you must find the defendant not guilty.

The district court did not err when it modified the instruction. Pursuant to I.C. § 19–2132(a), either party may present jury instructions, and request the court to so instruct the jury. "If the court thinks it correct and pertinent, it must be given; if not, it must be refused." I.C. § 19–2132(a). Mubita points to this language to support his proposition that, since he provided a written instruction, and there was no legal error in this instruction, the district court erred in denying his instruction. However, the court did give the affirmative defense instruction. The issue is whether the language the court added made the jury instruction improper. The State claims the reasonable belief language does not pertain to the affirmative defense, but applied to the burden that was on the State to prove the element of knowledge. Thus, this language did not shift the burden, but clarified that the ultimate burden remains with the State even if the jury rejected Mubita's affirmative defense. The

State's argument is well-taken. Viewed as a whole, the instructions fairly and adequately presented the issues and stated the applicable law.[18]

■■■ In addition, Mubita argues the instruction the district court gave, with added "reasonableness" language, misstates the law and resulted in a shifting of the State's burden of persuasion. According to Mubita, the language lightens the State's burden to prove each and every element of the case beyond a reasonable doubt. The United States Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 309, 99 S.Ct. 2781, 2783, 61 L.Ed.2d 560, 567 (1979) (quoting *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)). *See also State v. Crowe*, 135 Idaho 43, 47, 13 P.3d 1256, 1260 (Ct.App.2000) ("The requirement that the State prove every element of a crime beyond a reasonable doubt is grounded in the constitutional guarantee of due process."). A jury instruction that lightens prosecution's burden of proof by omitting an element of the crime, creating a conclusive presumption as to an element, or shifting to the defendant the burden of persuasion on an essential element is therefore impermissible. *Crowe*, 135 Idaho at 47, 13 P.3d at 1260 (citations omitted).

■■■ The threshold inquiry in ascertaining the constitutional analysis applicable to a jury instruction is to determine the nature of the presumption it describes. *Sandstrom v. Montana*, 442 U.S. 510, 514, 99 S.Ct. 2450, 2454, 61 L.Ed.2d 39, 44–45 (1979). That determination requires careful attention to the words actually spoken to the jury. *Id.* Whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction. *Id.* The instruction

itself ends with a statement reminding the jury "the burden is on the State to prove beyond a reasonable doubt that the defendant knew he was infectious at the time the attempted transfer of body fluid occurred. If there is reasonable doubt whether the defendant knew he was infectious, you must find the defendant not guilty." Looking to the words of the instruction, and viewing the instructions as a whole, it is clear a reasonable juror would not have understood this to relieve the prosecution's burden to prove each *element* of the offense beyond a reasonable doubt.

Further, the instruction here did not pertain to an element of the offense. Rather, the instruction pertained to Mubita's affirmative defense. Mubita cites no authority for the proposition that requiring a defendant to bear the burden of proving his affirmative defense violates due process. Relevant authority tends to the contrary. *See Martin v. Ohio*, 480 U.S. 228, 235–36, 107 S.Ct. 1098, 1102–1103, 94 L.Ed.2d 267, 275–76 (1987) (Ohio's practice of requiring self-defense to be proved by defendant did not violate due process; noting affirmative defenses were matters for defendant to prove at common law, when the Fifth Amendment was adopted, and later when the Fourteenth Amendment was ratified); *Montana v. Egelhoff*, 518 U.S. 37, 42, 56, 116 S.Ct. 2013, 2017, 2023–24, 135 L.Ed.2d 361, 367, 376 (1996) (nothing in the Due Process Clause prevents Montana from disallowing consideration of voluntary intoxication when a defendant's state of mind is at issue) ("The proposition that the Due Process Clause guarantees the right to introduce all relevant evidence is simply indefensible."). Thus, even assuming the instruction did in fact shift the burden of persuasion, Mubita has not demonstrated this violated his right to due process.

18. The State also asserts on appeal that Mubita was not entitled to a jury instruction on the affirmative defense as a matter of law. The State supports this contention with the claim that Mubita's interpretation of the statute would lead to an absurd result. "Mubita interprets this language to mean that if at any point in a person's life that person tested negative for HIV he has an automatic defense from prosecution under the statute regardless of whether at some later point

in his life he finds out he is HIV positive." Since Mubita presented no evidence that he received medical advice that he was noninfectious after being informed of his HIV positive status, Mubita was not entitled to his requested instruction. At trial, the State did not object to the jury instruction. In fact, the State conceded that Mubita presented enough evidence to obtain the instruction. Since the State did not object below, we decline to address this argument on appeal

## III.

### DISPOSITION

We affirm the district court's decision.

Chief Justice EISMANN, and Justices BURDICK, W. JONES and HORTON concur.

