## IN THE SUPREME COURT OF THE STATE OF IDAHO
### Docket No. 35003

JESUS HURTADO and JOHN REITSMA, dba J&J CALF RANCH,

  Plaintiffs-Respondents-Cross Appellants,

v.

LAND O'LAKES, INC., A Minnesota corporation, LAND O'LAKES PURINA FEED, LLC,

  Defendants-Appellants-Cross Respondents,

and

VALLEY CO-OPS, INC., an Idaho corporation; JOHN DOES and JANE DOES I-X, and JOHN DOE CORPORATIONS I-V,

  Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise June 2009 Term

2009 Opinion No. 111

Filed: August 25, 2009

Stephen W. Kenyon, Clerk

---

Appeal from the District Court of the Fifth Judicial District, State of Idaho, Twin Falls County. Hon. John M. Melanson, District Judge.

District court order denying new trial, <u>reversed</u> and <u>remanded.</u>

Maguire & Kress, Pocatello, for appellants. David H. Maguire argued.

Harry C. DeHaan, VI, Twin Falls, argued for respondents.

---

BURDICK, Justice

    This is an appeal from a jury verdict in favor of Respondents Jesus Hurtado and John Reitsma, d/b/a J&J Calf Ranch (J&J), against Appellants Land O'Lakes, Inc. and Land O'Lakes Purina Feed, LLC (Land O'Lakes). The jury awarded damages to J&J for the deaths of dairy heifer calves during the summer of 2005. The deaths allegedly occurred as a result of the calves'

1

consumption of adulterated milk replacer produced by Land O'Lakes. Land O'Lakes's motion for a judgment notwithstanding the verdict and motion for a new trial were denied and this appeal was timely filed. We reverse the district court's denial of the motion for a new trial and remand for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Prior to 2005, J&J purchased a Land O'Lakes product known as Purina 20/20 Milk Replacer to feed its heifer calves. Dairy calves are brought to the J&J calf ranch shortly after they are born and fed milk replacer during their first 60 days of life. In the spring of 2005, Hurtado, the supervisor of the ranch, was notified by the local supplier that Land O'Lakes was moving its manufacturing facilities for the Purina 20/20 Milk Replacer product to Black River Falls, Wisconsin. J&J began using the new milk replacer manufactured at the Black River Falls plant around June 1, 2005. Hurtado claims that around the time J&J began feeding the new milk replacer there was an increase in heifer calf mortality at the calf ranch. J&J claimed that, from June through October 2005, heifer calves died at a much higher rate than bull calves that were receiving a different milk replacer.

On August 29, 2005, the veterinarian for J&J, Dr. Ed Harness, examined several sick calves on the ranch and found they were exhibiting symptoms of scours. Based upon the history he received from employees at the ranch and what he observed, Dr. Harness recommended that J&J change the milk replacer and take samples to Caine Veterinary Teaching Center for testing. A sample of milk replacer and two fecal samples from sick calves were taken to the Caine Center and tested for adulteration. The report from the Caine Center indicated that one of the fecal samples was positive for Cryptosporidia, which is a cause of scours in calves. The report further stated that the milk replacer "is positive for Staphylococcus spp. and Streptococcus spp. significance undetermined." The veterinarian from the Caine Center testified that the staphylococcus and streptococcus were coagulates negative, which are rarely associated with disease.

In December 2005, J&J filed a lawsuit against Land O'Lakes alleging breach of contract, negligence in providing substandard feed and poor nutritional advice, and fraud. After a five day trial, the jury entered a verdict in favor of J&J in the amount of $150,000, reduced by 25% for J&J's own negligence. Land O'Lakes's motion for a judgment notwithstanding the verdict and motion for a new trial were denied. This appeal was timely filed.

2

## II. ANALYSIS

Land O'Lakes raises several issues on appeal, the first of which is whether the district court erred in admitting certain exhibits. Land O'Lakes contends the district court erred in admitting Plaintiffs' Exhibits 2, 3, 4, 5, 10, and 11 because there was no foundation establishing the exhibits as reliable business records as contemplated by I.R.E. 803(6). Land O'Lakes further asserts that the cumulative effect of the introduction of these exhibits was prejudicial.

Idaho Rule of Evidence 802 states: "Hearsay is not admissible except as provided by these rules or other rules promulgated by the Supreme Court of Idaho." However, "[t]he trial court has broad discretion whether to admit hearsay under one of the exceptions, and [this Court] will not overturn the exercise of that discretion absent a clear showing of abuse." *State v. Mubita*, 145 Idaho 925, 937, 188 P.3d 867, 879 (2008). When an exercise of discretion is reviewed on appeal, this Court inquires: (1) whether the lower court correctly perceived the issue as one of discretion; (2) whether the court acted within the boundaries of such discretion and consistently with any applicable legal standards; and (3) whether the court reached its decision by an exercise of reason. *Id*.

One exception to the hearsay rule under which the court may admit evidence is I.R.E. 803(6):

> **Records of regularly conducted activity.** A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

The general requirements for the admission of business records are that the documents be "produced in the ordinary course of business, at or near the time of occurrence and not in anticipation of trial." *Beco Corp. v. Roberts & Sons Constr. Co.*, 114 Idaho 704, 711, 760 P.2d 1120, 1127 (1988). These foundational requirements "supply the degree of trustworthiness necessary to justify an exception to the rule against hearsay." *Id*. It is necessary that the circumstances behind the creation of the business records "impl[y] a high degree of veracity." *Christensen v. Rice*, 114 Idaho 929, 934, 763 P.2d 302, 307 (Ct. App. 1988).

The exhibits that Land O'Lakes argues should not have been admitted include charts and graphs of the deaths of both heifer and bull calves in 2005, along with a summary of J&J's purchases of the milk replacer. Exhibit 2 is the number of monthly deaths of bull and heifer calves from March 2005 to December 2005. Exhibit 3 is the percentage of heifer calf losses from March to December, calculated by the number of deaths each month divided by the number of calves received at the ranch each month. Exhibit 4 is similar to Exhibit 3, but with monthly percentages for bull calf deaths. Exhibit 5 is also similar to Exhibit 3, but with totals for each of the chart categories. Exhibit 10 is the summary of J&J's milk purchases. Finally, Exhibit 11 is a graph comparing the bull and heifer calf losses for each month.

During trial, Hurtado testified that the monthly death loss percentages shown in Plaintiffs' Exhibits 3, and 4, and 5 were calculated by "count[ing] the calves at the end of the month and how many I receive that comes into the calf ranch and then just figure out how many die." Hurtado further testified that how many calves died each month, as shown in Plaintiffs' Exhibits 2, 3, 4, 5, and 11, was tracked through his "bucket method":

> When the calf die we pull the tag and we put it in the bucket and then we save for that month. And then we take—count them, how many they die, and if it's a big problem then I start doing something. In the meantime, if the calves are only die two-three percent, I don't worry about it.

Upon Land O'Lakes's objection to the admission of Plaintiffs' Exhibits 3 and 4, the following questioning of Hurtado also took place:

> Q. Are those exhibits prepared from your business records?
>
> A. Yes.
>
> Q. That's how you keep records?
>
> A. That's—I put it—after—a few months later when we started having problems I start putting it in Excel just to see if it was improving the problem. I usually lose 10 and I prepared basically for you guys.
>
> . . . .
>
> Q. So the basis for the records, we don't have that anymore, right?
>
> A. No.
>
> Q. You did use those buckets and those tags to prepare the exhibit, though, as I understand it; is that right?
>
> A. Yes.

4

Q. Now the summary that you prepared—and that's Exhibit Numbers 3 and 4— those are exhibits that you prepared for Mr. DeHaan as part of this lawsuit, correct?

A. That's correct.

Q. They weren't prepared in the ordinary course of your business?

A. No.

Counsel for Land O'Lakes objected to the admission of Plaintiffs' Exhibits 3, 4, and 5 on the basis that there was a lack of foundation and the exhibits were prepared in anticipation of litigation, not as business records. Following consideration of Land O'Lakes's objection to those exhibits, the district court ruled:

> The witness has testified that when calves die he puts the ear tags in a bucket, or buckets I guess, for calves and bulls, then he counts them and that's how he tells how many have died. He also mentioned that he knows how many baby calves he gets, and I believe there was some testimony about taking that into account at the end of the month.
>
> I'm not sure that this is all hearsay, and that of course is the exception that's cited here: That it's a memorandum or report or data compilation of acts by a person of knowledge kept in the course of the regularly conducted activity. You know, it speaks of records in any form, and I'm tempted to say, well, tossing the ear tags in a bucket is kind of a form of a record of a death of that calf. I believe that the testimony of the witness contains sufficient indicia that, under the rule of trustworthiness, that the evidence is the kind that may be admitted, despite the concerns that some of those tags might not have been thrown in by the witness himself. And based upon that testimony I'll overrule the objection. Exhibits 3, 4 and 5 will be admitted.

The court found Plaintiffs' Exhibits 2 and 11 contained information from the same source as Exhibits 3, 4, and 5; therefore, the same arguments were applied and the exhibits were admitted.

The district court examined Plaintiffs' Exhibits 2, 3, 4, 5, and 11, and Hurtado's testimony, and determined the testimony of Hurtado supplied the degree of trustworthiness necessary to justify the admission of the exhibits. We find that the district court abused its discretion in making this finding because the finding is not consistent with the applicable legal standards. Plaintiffs' Exhibits 2, 3, 4, 5, and 11 are not regularly kept business records within the meaning of I.R.E. 803(6) and thus the district court erred in admitting them. Although this Court does not require witnesses to know and use the exact language laid out in the rules of evidence to uphold an admission of evidence, and we are not so naïve as to think all business records will be perfectly maintained, we must be able to, at a minimum, discern compliance with I.R.E. 803(6)

from the testimony of the witness. That is, the testimony must indicate that the records were "produced in the ordinary course of business, at or near the time of occurrence and not in anticipation of trial." *Beco Corp.*, 114 Idaho at 711, 760 P.2d at 1127. Here, the testimony of Hurtado did not indicate that Plaintiffs' Exhibits 2, 3, 4, 5, and 11 were business records produced in the ordinary course of business, at or near the time of occurrence, and not in anticipation of trial.

First, the district court did not address a key component of Plaintiffs' Exhibits 3, 4, and 5—the number of calves received each month—outside of its statement: "[Hurtado] also mentioned that he knows how many baby calves he gets, and I believe there was some testimony about taking that into account at the end of the month." The only substantive testimony about Hurtado recording the number of calves received each month was Hurtado's statement that losses were calculated by "count[ing] the calves at the end of the month and how many I receive that comes into the calf ranch and then just figure out how many die." There was no testimony to establish that records of the number of calves received each month were even kept, let alone how such records were produced in the ordinary course of business, at or near the time of occurrence, and not in anticipation of trial.

Second, Plaintiffs' Exhibits 2, 3, 4, 5, and 11 were not themselves prepared in the ordinary course of business and not in anticipation of trial. While the district court found that the "bucket method" of record keeping had "sufficient foundation to support the records," we not only disagree but also find that the district court did not properly analyze the exhibits as business records, but instead seemed to consider them summaries. Hurtado testified that he only started recording the deaths "a few months later when we started having problems . . . just to see if it was improving the problem." He also testified that Exhibits 3 and 4 were prepared as part of the lawsuit and not in the ordinary course of the business. Given Hurtado's testimony, we find that the exhibits themselves were not prepared in the ordinary course of business and were prepared in anticipation of trial. Had J&J sought to introduce the exhibits as summaries, the exhibits would have had to comply with I.R.E. 1006. Pursuant to I.R.E. 1006, the original records must be available for examination. Hurtado testified that he no longer had the ear tags from which the number of monthly deaths was calculated. Therefore, we find the district court erred in admitting Plaintiffs' Exhibits 2, 3, 4, 5, and 11 because no testimony showed that the exhibits were prepared in the ordinary course of business or that they complied with I.R.E. 1006.

6

We find the admission of these exhibits to be prejudicial because, without evidence of the number of calves received each month and the monthly deaths for both bull and heifer calves, the jury would have been unable to compare bull and heifer calf death rates. Those percentage differences were critical to J&J's showing of causation by circumstantial evidence. Therefore, we reverse the district court's denial of Land O'Lakes's motion for a new trial and remand for further proceedings. Because we vacate on the ground that the district court erred in admitting Plaintiffs' Exhibits 2, 3, 4, 5, and 11, we need not address the other issues raised on appeal.

Finally, Land O'Lakes argues that it is entitled to attorney fees on appeal pursuant to I.C. § 12-120(3). J&J also requests attorney fees on appeal, and argues that the district court erred in not awarding J&J attorney fees below. However, J&J provides no legal support for its request for attorney fees.

"[Idaho Code § 12-120(3)] ... allows recovery of attorney fees by the prevailing party in any commercial transaction." *Mackay v. Four Rivers Packing Co.* 145 Idaho 408, 415, 179 P.3d 1064, 1071 (2008). Land O'Lakes is the prevailing party on appeal and, therefore, entitled to attorney fees pursuant to I.C. § 12-120(3). Costs to Land O'Lakes.

### III. CONCLUSION

We vacate the jury verdict awarding damages to J&J for the deaths of its dairy heifer calves, reverse the district court's denial of Land O'Lakes's motion for a new trial, and remand for further proceedings.

Chief Justice EISMANN and Justices J. JONES, W. JONES and HORTON, **CONCUR.**

7